STATE OF NEBRASKA, APPELLEE, V.
DENNIS F. STARK, APPELLANT.
718 N.W.2d 509

Filed July 28, 2006. No. S-05-070.

Gregory A. Pivovar, and, on brief, Michael F. Maloney for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

GERRARD, J.

## NATURE OF CASE

Dennis F. Stark was convicted of first degree murder and use of a deadly weapon to commit a felony, and he was sentenced to a term of life imprisonment and 15 to 20 years' imprisonment, to be served consecutively. After obtaining a new direct appeal through a postconviction action, Stark appeals his convictions and sentences.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 27, 2002, Victoria Fortune's body was discovered near U.S. Highway 75 in Washington County, Nebraska. An

autopsy revealed that she died as a result of blunt force trauma to the head. On August 28, Donald Ficenec, an officer with the Omaha Police Department and detective in the homicide unit, became involved in the investigation of Fortune's murder. Ficenec obtained information from Fortune's friends regarding her close friendship with Eric Bylund and involvement with the defendant, Stark. Upon visiting Bylund's home, Ficenec interviewed, among others, Bylund's roommate, Scott McNeill. Ficenec spoke to McNeill several more times after August 28, and on September 4, McNeill contacted Ficenec and confessed to his involvement in the Fortune murder. Based on the information provided by McNeill, he and Stark were arrested for Fortune's murder. In October 2002, Stark was charged with first degree murder and use of a deadly weapon to commit a felony. In exchange for McNeill's testimony against Stark at trial, McNeill was to be charged with second degree murder.

McNeill moved to Omaha, Nebraska, on August 5, 2002, and moved into Bylund's house, across the street from Stark. McNeill met Stark through Bylund and another of Bylund's roommates and began working for Stark shortly after moving to Omaha. McNeill helped Stark with his power-washing business and helped him build a retaining wall at his house. McNeill also met Fortune through his roommates, with whom she was good friends.

Stark met Fortune through Bylund toward the end of 2001 and began a sexual relationship with her in February or March of the following year. At trial, Stark testified that when he ended the relationship in June 2002, Fortune continued to contact him and informed his wife of the affair.

During the trial, McNeill and Stark presented conflicting accounts of the events leading to Fortune's murder.

*McNeill's Testimony.*

McNeill testified that sometime in the late hours of August 24 or early hours of August 25, 2002, he went over to Stark's house. He and Stark drank beer, smoked marijuana, and played pool. The two men then left the house in Stark's vehicle to get more beer and stopped at Fortune's house.

McNeill stated that once they arrived at Fortune's house, he and Stark drove around the block and down an alley. Stark

parked the vehicle and went to the door to knock. When nobody answered the door, Stark went around to the steps at the side of the house. Stark climbed the steps, while McNeill stood below. Stark and McNeill returned to the vehicle and drove to a gas station around the corner where Stark used the telephone to call Fortune's house. The two men drove back around to Fortune's house; McNeill got out and stood by the vehicle, while Stark went up to the house to look in a window. When Stark returned, the two men got in the vehicle and drove away.

McNeill testified that he and Stark returned to Stark's house for another game of pool, more beer, and more marijuana. McNeill went upstairs and "shot a bag [of heroin] up." When McNeill came back downstairs, Stark indicated that Fortune had called and was coming over to the house. Fortune arrived, and the three of them drank beer and smoked marijuana outside on the patio. The group then moved inside to the basement, where they played pool and continued drinking and smoking marijuana. McNeill testified that he and Stark ended up in the laundry room, where Stark said that he wanted to kill Fortune, and picked up a hammer from a toolbox sitting behind him and handed it to McNeill. McNeill placed the hammer in the back of his pants, and the two men left the laundry room. McNeill testified that Stark nodded toward Fortune, at which point McNeill pulled out the hammer and hit Fortune in the head. McNeill testified that the hammer left his hands but could not recall if he threw the hammer or dropped it. Fortune was on her hands and knees, gripping her head, when Stark came over and hit her with the hammer in the same spot. Fortune fell to the floor, and Stark hit her two more times. McNeill testified that Fortune began making noises, took a deep breath, and stopped moving.

McNeill explained that Stark wrapped the hammer in a T-shirt and retrieved two pairs of gloves from the laundry room. McNeill picked up Fortune and carried her to the garage; Stark tied a bag over her head to contain the blood. The men placed the body on a tarpaulin in the back of Stark's vehicle. Stark gave McNeill the keys to Fortune's car and instructed McNeill to meet him at a carwash. The men left Fortune's car parked at the carwash and drove for approximately 30 minutes before dumping Fortune's body on the side of the road.

McNeill and Stark returned to Stark's house, stopping on the way at a carwash to wash the exterior and part of the interior of the vehicle. Back at Stark's home, McNeill and Stark used buckets of "Oxi-Clean" to clean up the blood in the basement and placed the rags used to clean, and other bloodstained items, in a trash bag along with their clothing and the bath towels they used after showering. The men took the trash bag outside to Stark's backyard and buried it, covered it with cement, and placed Stark's doghouse on top of it. After cleaning up the basement, McNeill and Stark smoked marijuana. Stark then received a call from his wife in Harlan, Iowa, asking him to bring something to her. Stark left for Harlan, and McNeill went home.

*Stark's Testimony.*

Stark testified that he was working on his retaining wall on August 24, 2002, from 10 a.m. until 2:30 or 3 p.m. He then went inside, took his clothes off at the bottom of the stairs in the basement to avoid tracking dirt through the house, and went upstairs to clean up. Stark left his house at 3 or 3:15 p.m. in his flatbed pickup, to power wash in Valley, Nebraska.

Stark testified that he power washed until 1:30 a.m. on the morning of August 25, 2002. When he returned to his house after work, Stark testified that his vehicle was backed up to his garage door. Stark went inside to let his dogs out and sat down in the backyard with a beer and smoked marijuana. McNeill came from the south side of Stark's house to the backyard and joined Stark for a beer and some marijuana.

Stark testified that McNeill wanted to play pool, so the two men proceeded to the basement. Stark explained that when he went downstairs, he saw a blue tarpaulin at the bottom of the stairs containing what appeared to be a body. When Stark inquired about it, McNeill stated that "he fucked up" and that "this is [Fortune]." Stark responded that they had to get rid of the body, worrying that the police would suspect him, since he had had an affair with Fortune and the murder took place at his house.

Stark testified that he helped McNeill carry Fortune's body to the garage and load it into the vehicle. The two men drove out toward Fort Calhoun, Nebraska, where they dumped Fortune's body on the side of the road. Stark stopped at a carwash to clean

the vehicle, went home, and fell asleep on the couch after showering. Stark testified that McNeill cleaned the basement.

*Other Testimony.*

At trial, the State presented the testimony of Alexander Sturgeon, who lives across the street from Fortune's house. Sturgeon testified that between 2:40 and 3 a.m. on August 25, 2002, he heard an idling truck outside and looked outside to find a vehicle matching the description of Stark's. He testified that the vehicle went around the block a few times. It then parked, and two men got out. Sturgeon was able to describe the individuals. He testified that the men "snooped" around Fortune's house before getting back in the vehicle and driving through the alley. Then, the driver got out of the vehicle and climbed the stairs at the side of the house, while the passenger stayed down below. At this point, Sturgeon called the 911 emergency dispatch service and testified that "[i]t just didn't look right." Sometime later, Sturgeon observed police officers and crime scene tape around Fortune's house and immediately told the officers what he saw on the morning of August 25.

Following the jury trial, Stark was found guilty of both first degree murder and use of a deadly weapon to commit a felony and, subsequently, received sentences of life imprisonment and 15 to 20 years' imprisonment, to be served consecutively. After Stark's trial counsel failed to file an appeal, Stark filed a motion for postconviction relief asking the court to reinstate his right to file an appeal. The district court sustained the motion, and accordingly, Stark filed the present appeal. See *State v. McCracken*, 260 Neb. 234, 615 N.W.2d 902 (2000), *abrogated on other grounds, State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002).

## ASSIGNMENTS OF ERROR

Stark assigns that the district court erred in (1) refusing to instruct the jury on his theory that he was only an accessory to a felony, (2) overruling his objection to the prosecutor's statements during closing argument that Stark argues were unsupported by the evidence, (3) preventing questioning of McNeill regarding McNeill's fear of the death penalty and McNeill's

motion to suppress his statement to the police, and (4) testifying from the bench that the death penalty was not an issue in the case and instructing the jury not to consider information regarding the death penalty. Stark also argues that his trial counsel was ineffective in failing to object to testimony given by police officers Ficenec and Larry Cahill.

## STANDARD OF REVIEW

Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005).

Conduct of final argument is within the discretion of the trial court, and absent an abuse of that discretion, the trial court's ruling regarding final argument will not be disturbed. *Haag v. Bongers*, 256 Neb. 170, 589 N.W.2d 318 (1999).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Grosshans*, 270 Neb. 660, 707 N.W.2d 405 (2005). The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion. *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003).

## ANALYSIS
*District Court Did Not Err in Denying Stark's*
*Proposed Jury Instruction.*

During the jury instruction conference with the court, Stark proposed a jury instruction on the crime of accessory to a felony. The instruction described the elements of the crime of accessory to a felony and instructed that if the jury finds that the State established each element beyond a reasonable doubt, the jury is dutybound to find the defendant guilty of the crime of accessory to a felony, and vice versa. The court denied the request,

concluding that a defendant must "be charged with the crime in order to be instructed on the elements of that crime."

Stark assigns that the district court erred in failing to instruct the jury on his defense theory, accessory to a felony, thereby prejudicing Stark by withdrawing an essential issue from the jury and preventing trial counsel from informing the jury of the distinctions between the crimes of aiding and abetting and accessory to a felony. In contrast, the State asserts that the instruction was properly rejected because Stark was not charged with the crime of accessory to a felony, nor was the crime a lesser-included offense of first degree murder.

■ To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004). Without addressing the first two elements, this court can dispose of Stark's first assignment of error based on the lack of prejudice resulting from the court's refusal to give the instruction.

■ In this case, Stark was charged with first degree murder and use of a deadly weapon to commit a felony. The jury was instructed on the elements of each offense and the lesser-included offenses of second degree murder and manslaughter. The jury was also properly instructed on the concept of aiding and abetting—that is, that a person who aids, abets, procures, or causes another to commit any offense may be prosecuted as if he or she were the principal offender. See *State v. Contreras*, 268 Neb. 797, 688 N.W.2d 580 (2004). Given the provisions of Neb. Rev. Stat. § 28-206 (Reissue 1995), an information charging a defendant with a specific crime gives the defendant adequate notice that he or she may be prosecuted for the crime specified or as having aided and abetted the commission of the crime specified. *Contreras, supra*.

As the defendant, Stark's goal was to rebut evidence presented by the State attempting to establish that he committed, or aided in the commission of, the crime of murder. Stark argues that his theory of defense was inhibited by the court's refusal to instruct

the jury as to the crime of accessory to a felony because he was prevented from drawing distinctions for the jury between aiding and abetting and the crime of accessory. However, the court's failure to instruct the jury as requested did not inhibit Stark's right or ability to defend himself against the crimes charged.

As defined in Neb. Rev. Stat. § 28-204 (Cum. Supp. 2004), the crime of accessory to a felony involves action taken by an individual with the intent to "interfere with, hinder, delay, or prevent the discovery, apprehension, prosecution, conviction, or punishment of another for an offense." As defined, the crime is based upon action taken after the crime is committed. Thus, any attempt by Stark to show evidence establishing his role as an accessory to Fortune's murder would not have assisted him in arguing that he did not aid and abet in the commission of the murder. In other words, even if Stark presented evidence at trial establishing that he was an accessory to the murder, such proof would not have precluded a finding of guilt in aiding and abetting the commission of the crime. Thus, the court's refusal to instruct the jury on the crime of accessory to a felony did not prejudice Stark's defense.

In addition, instructing the jury on the elements of accessory to a felony—a crime of which Stark was not accused—would have tended to confuse and distract the jury in this case. A jury instruction which misstates the issues and has a tendency to confuse the jury is erroneous. *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994). It is more than mere probability that an instruction on a matter not an issue in the litigation distracts a jury in its effort to answer legitimate, factual questions raised during trial. *Id.* Accordingly, the court did not err in refusing Stark's proposed instruction, and the first assignment of error is without merit.

*Stark's Defense Was Not Prejudiced as Result of State's References During Closing Argument to Sturgeon's 911 Call.*

While discussing Sturgeon's testimony during closing argument, the State argued, in part:

> [Sturgeon] saw people matching the defendant's description that he gave you and McNeill's description that was very specific. And it's not a guess of time. We're not estimating.

> It's not guessing time when . . . Sturgeon saw this because
> he called 911 and they record calls at 911. So we know that
> . . . Sturgeon made a call to 911 at 2:59 a.m., Saturday,
> August 25th.

Stark objected on the basis that neither the 911 call, nor any evidence concerning the exact time at which the 911 call was made, was offered into evidence. The court sustained the objection to the extent that no evidence was presented regarding the exact time of the 911 call. However, the court otherwise overruled the objection, explaining that Sturgeon did testify to calling 911 and also testified about the time of his observations.

Stark argues that the State referred to evidence that was not presented during trial and, therefore, not properly before the jury and that the State used such information to bolster the credibility of Sturgeon's testimony. Thus, Stark claims that the court erred in overruling his objection.

The State argues that because Stark failed to make a motion for a mistrial after the State's allegedly prejudicial remarks during closing, he did not properly preserve the issue for appeal. Alternatively, the State argues that even if Stark had preserved the issue for appeal, the statements at issue did not prejudice his rights and, therefore, did not warrant a mistrial.

In this case, the court properly sustained Stark's objection as to the State's references to evidence of the official record of Sturgeon's 911 call because such a record was not presented at trial. However, Sturgeon did testify about the approximate time and duration of his observations on August 25, 2002, stating that he saw Stark's vehicle "[p]robably around 2:40, three o'clock [a.m.], somewhere around there" and that the two men were in the area for no more than 45 minutes. Furthermore, Sturgeon testified that during that time, he called 911 to report the suspicious activity.

After the objection was sustained, the State argued:

> Sturgeon came in and he told you that the time that he
> called 911, it was Saturday night about 2:59 a.m. — excuse
> me, Sunday morning about 2:59 a.m., and he called 911
> and he reported to 911 at that time on Sunday morning that
> he saw [Stark's vehicle] and he saw the activities that he
> reported to the police. Keep that in mind.

Stark failed to object following this second reference to the time of Sturgeon's 911 call during the State's closing argument. Furthermore, although the prosecutor was incorrect in arguing that Sturgeon testified that he called 911 at 2:59 a.m., that argument did not suggest that there was independent verification of Sturgeon's testimony. Although technically inaccurate, the State's reference to 2:59 a.m. as the recorded time of the 911 call was within the time period to which Sturgeon testified that he made his observations and called 911 and, thus, cannot be said to have effected a substantial miscarriage of justice. Finally, we cannot say that Stark was prejudiced when Stark did nothing during Sturgeon's testimony to challenge his credibility. Simply put, Stark did not dispute Sturgeon's testimony. Therefore, Stark's second assignment of error is without merit.

*Stark's Right to Confront Witnesses Through Cross-Examination Was Not Violated by Court's Actions in Limiting Inquiry Regarding McNeill's Fear of Death Penalty and Attempt to Suppress His Statements to Police.*

Stark assigns that the district court erred in sustaining the State's relevancy objections, preventing testimony by McNeill regarding his fear of receiving the death penalty and McNeill's motion to suppress his own statement to police. Stark asserts that such testimony was relevant to reveal McNeill's motivation in cooperating with the State in its case against Stark and McNeill's credibility in testifying against Stark. As a result of the court's ruling, Stark argues that he was deprived of his right to confront witnesses against him.

The State argues that Stark failed to preserve the issue for appeal because he failed to make known to the trial judge the substance of the evidence he was attempting to offer through the cross-examination of McNeill. The State argues that Stark's right to confront McNeill was not violated because he was not prohibited from all inquiry into McNeill's concerns about the death penalty. The State asserts that the court properly limited questioning of McNeill regarding his own prosecution, thereby excluding irrelevant testimony and guarding against jury confusion. Finally, the State argues that any error committed by the court in limiting the cross-examination of McNeill resulted in harmless error.

 The right of a person accused of a crime to confront the witnesses against him or her is a fundamental right guaranteed by the 6th amendment to the U.S. Constitution, as incorporated in the 14th amendment, as well as by article I, § 11, of the Nebraska Constitution. *State v. Johnson*, 255 Neb. 865, 587 N.W.2d 546 (1998). The functional purpose of the Confrontation Clause is to ensure the integrity of the fact-finding process through the provision of an opportunity for effective cross-examination. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination. *Johnson, supra*; *State v. Privat*, 251 Neb. 233, 556 N.W.2d 29 (1996).

 The right of cross-examination, however, is not unlimited. *State v. Dixon*, 240 Neb. 454, 482 N.W.2d 573 (1992). The U.S. Supreme Court, in *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), has held:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, *confusion of the issues*, the witness' safety, or *interrogation* that is repetitive or *only marginally relevant*.

(Emphasis supplied.) This court has also recognized the well-established rule in this jurisdiction that " ' " 'the scope of cross-examination of a witness rests largely in the discretion of the trial court and its ruling will be upheld on appeal unless there is an abuse of discretion.' " ' " *Dixon*, 240 Neb. at 463, 482 N.W.2d at 579.

In this case, Stark was not prohibited from cross-examination of McNeill to show bias. Rather, Stark was permitted to question McNeill about the reduction of his charges to second degree murder and his concern with getting the death penalty without objection. Such evidence was sufficient to support an argument that McNeill had a motive to confess and testify against Stark,

thereby questioning McNeill's credibility. Furthermore, because Stark was permitted to elicit such testimony from McNeill, it cannot be said that the jury would have received a significantly different impression of McNeill's credibility had Stark been permitted to pursue the cross-examination prevented by the court in this case.

McNeill's filing of motions to suppress his confession in the proceedings pending against him was not probative with respect to McNeill's credibility and motive to testify falsely against Stark. Information regarding McNeill's attempt to suppress statements he made to police in proceedings against him was irrelevant and could have caused jury confusion.

Given the lack of probative value of the excluded testimony and the scope of cross-examination that was permitted, we conclude that the court did not abuse its discretion. Stark's third assignment of error is without merit.

*Statements Made by Court to Jury During Closing Arguments Did Not Result in Prejudice to Stark's Defense.*

Discussing McNeill's credibility during closing argument, Stark argued, "[McNeill] had a huge motivation to sit up here and tell you the story he told you up here because he got a deal for it. He got second-degree murder. They took . . . death off the table." Following these comments, the State objected and asked the court to remind the jury that "in neither case at any time was the death penalty ever an issue in this case." The court indicated that such a statement was accurate, and after a conversation with counsel at the bench, the court stated to the jury, "You're instructed not to consider any information regarding the death penalty. It was not an issue in either case."

Stark asserts that the court erred in making these statements to the jury because not only were they inaccurate, but they served to bolster McNeill's credibility, indicating that McNeill was not motivated to lie during his testimony due to his fear of the death penalty.

The State asserts that both parties, as well as the court, informed jurors that the death penalty was not at issue in the case during voir dire, without any objection by Stark, and that therefore, similar statements made by the court during closing were not prejudicial. In addition, the State argues that Stark's

statements regarding the State's separate prosecution of McNeill—"[t]hey took . . . death off the table"—were not supported by evidence presented at trial. In other words, the State asserts that Stark failed to present any evidence that the State had filed an information charging McNeill with first degree murder, providing notice of aggravating circumstances to support punishment by death.

Trial courts are to refrain from commenting on evidence or making remarks prejudicial to a litigant or calculated to influence the minds of the jurors. However, a defendant must demonstrate that a trial court's conduct, whether action or inaction during the proceeding against the defendant, prejudiced or otherwise adversely affected a substantial right of the defendant. *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004). When there is some incorrect conduct by a trial court which, on review of the record, did not materially influence the jury in a verdict adverse to a substantial right of the defendant, the error is harmless. See *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004).

Even if the court erred in making the statements complained of, the comments were not prejudicial. Stark's attack of McNeill's credibility during closing argument was adequately supported by referencing McNeill's testimony, through which it was apparent that McNeill received a reduced charge for his testimony at trial, regardless of whether the death penalty was applicable, and that McNeill had lied to officers prior to making his confession. Thus, Stark's fourth assignment of error is without merit.

*Defense Counsel's Failure to Object to Specific Testimony Given by Ficenec and Cahill Did Not Result in Prejudice to Stark's Defense.*

Finally, Stark asserts that he received ineffective assistance of counsel at trial due to his attorney's failure to object to certain testimony given by Ficenec and Cahill, who participated in the search of Stark's residence and the excavation of the backyard. Specifically, Stark argues that his trial counsel was ineffective in failing to object to Ficenec's testimony regarding his attempt to subject McNeill to a polygraph examination; Ficenec's testimony about a conversation he had had with McNeill prior to his confession, during which Ficenec stated that he believed that

Stark killed Fortune and that McNeill helped dispose of the body; and the testimony of Ficenec and Cahill that they used information provided by McNeill to obtain warrants to arrest Stark and search his home.

Stark brings his claim of ineffective assistance of counsel on direct appeal. However, such a claim need not be dismissed merely because it is made on direct appeal. See *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005). The determining factor is whether the record is sufficient to adequately review the question. *Id.* If the matter has not been raised or ruled on at the trial level and requires an evidentiary hearing, an appellate court will not address the matter on direct appeal. *State v. Moyer*, 271 Neb. 776, 715 N.W.2d 565 (2006). We determine that given the nature of these issues, in the absence of testimony as to counsel's strategy for not raising certain objections at trial, the record is not sufficient to evaluate the effectiveness of trial counsel. Thus, we do not consider Stark's ineffective assistance of counsel arguments in this appeal.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

WRIGHT and MILLER-LERMAN, JJ., participating on briefs.