STATE OF NEBRASKA, APPELLEE, V.
DENISE KUEHN, APPELLANT.

728 N.W.2d 589

Filed March 16, 2007. No. S-05-888.

George H. Moyer, of Moyer, Moyer, Egley, Fullner & Montag, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Denise Kuehn provided childcare in her home in Norfolk, Nebraska. After a child she cared for became seriously injured, Kuehn was charged with child abuse. A jury found her guilty of negligent child abuse. Kuehn argues that certain medical testimony should have been excluded and that evidence of prior injuries to the child in question was improperly admitted. For the reasons stated herein, the judgment of the district court is affirmed.

## SCOPE OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006).

■ The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005).

## FACTS

On August 4, 2004, 10-month-old Cameron Lampert was seriously injured at Kuehn's home. Kuehn testified that as she began to lift Cameron out of a playpen, he arched his back, fell, and hit his head on the corner of the playpen. She said he landed on his back on the floor of the playpen, striking his head a second time. The playpen had a padded base and fabric sides with netting that covered the collapsible frame. In an interview with police, Kuehn stated that she may have shaken Cameron once as she picked him up but that he then fell out of her arms and hit his head on the playpen.

After the fall, Cameron began fussing and trying to get out of the playpen. He stood up and fell backward. Kuehn said Cameron "didn't seem right," his eyes were almost completely closed, and he was limp. When Cameron's father, Brian Lampert (Lampert), arrived, Kuehn suggested he take Cameron to the hospital or a doctor.

Lampert testified that Cameron was lethargic and limp, and his eyes had rolled back in his head. He knew immediately that something was wrong, and he took Cameron to the hospital in Norfolk, Nebraska. Cameron was then taken by helicopter to Children's Hospital in Omaha, Nebraska. There it was determined that he had a subdural hematoma. Cameron also sustained retinal hemorrhages in all four quadrants of each eye.

Medical experts testified that Cameron's injury was caused when the two hemispheres of his brain were moved violently back and forth inside the skull. Dr. Jeffrey DeMare, medical director of the children's advocacy team at Children's Hospital, testified that Cameron's injury was entirely consistent with a child's being violently shaken and was not caused by a fall and blow to the skull, as described by Kuehn.

Cameron was hospitalized for approximately 1 month. Upon discharge, he was unable to hold up his head or move his left arm and he had to be fed through a tube to his stomach. A shunt had been placed in his head to remove pressure on his brain. At the time of trial, Cameron was 18 months old and was unable to sit up

for more than 30 seconds. He was developmentally delayed and blind, suffered from epilepsy, and had spasticity, or rigid muscles, on his left side.

A jury acquitted Kuehn of intentional child abuse but convicted her of negligent child abuse. She was sentenced to 24 months' probation, fined $1,000, and ordered to pay court costs of $1,519.56. The terms of her probation required her to serve 90 days in jail, including 30 days immediately and the balance at the end of her probation. Kuehn was ordered to perform 200 hours of community service, and she was ordered not to provide any type of childcare program without first obtaining a state childcare license. She appeals.

## ASSIGNMENTS OF ERROR

Kuehn assigns the following errors, which, summarized and restated, claim that the district court erred in (1) overruling her objections to medical testimony; (2) allowing evidence of prior bad acts; (3) ordering Kuehn to pay certain deposition expenses; (4) instructing the jury; (5) overruling her motion to dismiss or, in the alternative, for a directed verdict; (6) allowing impeachment of a defense witness; and (7) imposing an excessive sentence.

## ANALYSIS

### ADMISSION OF MEDICAL TESTIMONY

■ Kuehn objects to the admission of certain evidence, including testimony of the physicians who treated Cameron. The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005). Four factors govern the admissibility of expert testimony: (1) whether the witness is qualified as an expert, (2) whether the testimony is relevant, (3) whether the testimony will assist the trier of fact, and (4) whether the probative value of the testimony, even if relevant, is outweighed by the danger of unfair prejudice or other considerations. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). See, also, *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990), *disapproved on other grounds, State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991). We therefore consider whether the district court abused its discretion in admitting the medical testimony.

Dr. Ivan Pavkovic, a pediatric neurologist who treated Cameron after his injury, testified that Cameron was developmentally delayed and blind, displayed spasticity, and had epilepsy as the result of a brain injury. Pavkovic stated that Cameron's injury was caused by rotational force, which occurs when the brain is rotated inside the skull. CT scans of Cameron's brain showed atrophy, which indicated a brain injury. Cameron's brain was shrunken, and corresponding fluid-filled spaces outside the brain were larger than normal because his brain was smaller than normal. His brain damage was diffuse. Pavkovic stated that a subdural hematoma which pressed on the surface of the brain caused dysfunction and problems such as motor function, paralysis, or seizures. Pavkovic testified that blunt trauma to an infant rarely results in subdural hemorrhage and even more rarely results in retinal hemorrhage, both of which were evident in Cameron. Pavkovic stated that Cameron's condition was due to inflicted or nonaccidental traumatic injury to the brain. CT scans and MRI results indicated that Cameron had also sustained subdural hematomas in the weeks or months prior to August 2004.

In response to Kuehn's objection of no proper and sufficient foundation, speculation, and conjecture, Pavkovic stated:

> [Cameron's] initial presentation to the hospital . . . involved the presence of subdural hematomas . . . one of which was chronic. [O]ne was new. He had bleeding into both his retinal, what we call retinal hemorrhages and he had mental status changes and initially seizure activity too. And when you take all of those positive findings in combination with the fact that there was no history to support any kind of major trauma to his head, the only conclusion that can be reached is that this was some type of inflicted traumatic injury to his brain.

Additional medical testimony was provided by DeMare, who stated that Cameron's physical findings were consistent with an inflicted traumatic brain injury. He explained that any time a child has a brain injury as significant as Cameron's, it is the result of a significant amount of force. DeMare stated:

> This is the kind of injury we'd expect from a fall from a couple stories high, from a high speed car accident, that's the kind of force we're talking about. In the absence of any

explanation that would mirror that, we have to assume that inflicted injury is the only other reasonable explanation.

. . . .

[This is] a child who's got a brain injury that would require enough force that there's no way that it could happen without somebody knowing what happened. We're talking about a lot of force here. This isn't just a[n], oops, someone — the kid fell over and hit his head and this injury happened. There's a lot of force that's involved and someone must know what happened to the child.

In addition to Pavkovic and DeMare, testimony was received from several other medical experts. Dr. Phillip Eckstrom, a radiologist who performed a CT scan on Cameron on August 4, 2004, stated that Cameron had subdural hematomas on both sides of the brain which were of different ages. This indicated that Cameron had experienced trauma at more than one time prior to August 4. Eckstrom was asked if he had an opinion as to the force normally associated with the injury Cameron had suffered, and over Kuehn's objection, Eckstrom said the injury was caused by rotational force. Dr. Robert Troia, an ophthalmologist, stated that Cameron's blindness was due to retinal hemorrhages Cameron had suffered. Dr. Daniel Davis, a forensic pathologist, stated that on August 4, Cameron suffered a primary sublethal brain injury that involved deep structures of his brain and possibly his upper cervical spinal cord.

Throughout the medical testimony, Kuehn interposed objections based on lack of foundation, speculation, conjecture, and a violation of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). These objections were overruled.

On appeal, Kuehn claims the district court improperly overruled her objections based on speculation and conjecture. We interpret her argument as a complaint that the medical testimony should not have been admitted because the physicians did not couch their opinions in terms of "reasonable medical certainty."

■ The preferred form of establishing the certainty of a medical expert's opinion is to ask for the opinion in terms of a reasonable degree of certainty or probability. In *Paulsen v. State*, 249 Neb. 112, 121, 541 N.W.2d 636, 643 (1996), we stated:

Our well-known preference for the use of the phrases "reasonable degree of medical certainty" or "reasonable degree of probability" is an indication to courts and parties of the necessity that the medical expert opinion must be stated in terms that the trier of fact is not required to guess at the cause of the injury.

Where the medical expert's testimony gives rise to conflicting inferences of equal degree of probability such that the choice between them is a matter of conjecture, the testimony should be excluded. See *id.* An opinion which is equivocal and is based upon such words as "could," "may," or "possibly" lacks the certainty required to sustain the burden of proof of causation for which the opinion has been offered.

We have stated that "[a]lthough expert medical testimony need not be couched in the magic words 'reasonable medical certainty' or 'reasonable probability,' it must be sufficient as examined in its entirety to establish" a crucial causal link between a victim's injuries and a defendant's actions. See *Fackler v. Genetzky*, 263 Neb. 68, 74, 638 N.W.2d 521, 527-28 (2002) (referring to link between plaintiff's injuries and defendant's negligence).

█ An expert's opinion is to be judged in view of the entirety of the opinion and is not validated or invalidated solely on the presence or lack of the words "reasonable degree of medical certainty or probability." See *Paulsen v. State*, 249 Neb. at 121, 541 N.W.2d at 643. Such words are not necessary. See, *Edmonds v. IBP, inc.*, 239 Neb. 899, 479 N.W.2d 754 (1992); *Hohnstein v. W.C. Frank*, 237 Neb. 974, 468 N.W.2d 597 (1991). The expert's opinion must be sufficiently definite and relevant to provide a basis for the fact finder's determination of an issue or question. See *Hohnstein v. W.C. Frank, supra.* Whether an expert's opinion is too speculative to be admitted is a question for the trial court's discretion. *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003).

In the case at bar, the principal witnesses on the issue of causation were Pavkovic and DeMare. Both stated that Cameron's injuries were caused by inflicted or nonaccidental trauma to the brain. The physicians did not speculate as to the cause of Cameron's injury. They testified that (1) the injury was caused by rotational force when the brain was rotated inside the skull; (2) blunt

trauma in an infant rarely results in a subdural hemorrhage such as that suffered by Cameron; (3) blunt trauma even more rarely causes retinal hemorrhages such as those seen in Cameron; (4) Cameron's injury was due to inflicted or nonaccidental traumatic injury to the brain; (5) a brain injury as significant as Cameron's is the result of a significant amount of force, such as a fall from a height of several stories or a high-speed car accident; and (6) Cameron's injury was entirely consistent with a child's being violently shaken. Pavkovic testified that inflicted traumatic brain injury was the "only conclusion that [could] be reached" on the basis of the history and objective findings. DeMare testified that in the absence of a history of significant accidental trauma, an "inflicted injury [was] the only other reasonable explanation."

As noted above, four factors govern the admissibility of expert testimony. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). Kuehn does not question the first factor: whether any of the witnesses were qualified to present expert testimony. The second factor concerns whether their testimony was relevant. The medical expert testimony was relevant to the question of whether Cameron's injury was sustained by accident or through an intentional action. The third factor is whether the experts' testimony will assist the trier of fact. In this case, it assisted the jury in understanding the extent of Cameron's injury and the manner in which it occurred, which was a controverted factual issue. We also find that the fourth factor was present: The probative value of the evidence was not outweighed by the danger of unfair prejudice.

Therefore, we conclude that the district court did not abuse its discretion in admitting the State's testimony elicited from the medical experts. The evidence was sufficient to sustain the jury's verdict finding Kuehn guilty of negligent child abuse.

Kuehn also interposed objections throughout the testimony of Pavkovic and DeMare as being in violation of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Because these objections were overruled, we will address whether admission of the testimony violated the requirements of *Daubert*.

During a pretrial hearing referred to as a "Daubert hearing" by the district court, Dr. Robert Prokop, a forensic pathologist who

had reviewed Cameron's records, opined that an injury could not be defined as intentional or accidental without knowledge of the entire facts of the incident. Prokop's testimony was the only evidence offered by Kuehn at the hearing.

In a *Daubert* challenge, the initial task falls on the party opposing expert testimony to sufficiently call into question the reliability of some aspect of the anticipated testimony, and then the proponent of the expert testimony has the burden of showing that the testimony is reliable. See *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006). Prokop suggested that Cameron's injury could not be defined as intentionally inflicted when all of the facts related to the incident were not known. We do not consider Prokop's testimony to be *Daubert* evidence, but, rather, an attempt to impeach the medical evidence presented by the State. The district court did not abuse its discretion in overruling Kuehn's objections made on the basis of *Daubert*.

Kuehn also complains that the district court erred in failing to sustain her hearsay objection to a statement made by Dr. Joe Metcalf II, an emergency room physician, to Joe O'Brien, a police investigator. On redirect examination by the State, O'Brien stated that he had asked Metcalf whether Cameron's injuries could have been caused by dropping the child. Kuehn objected on the bases of hearsay and improper redirect because O'Brien was being asked about statements in his deposition. The court sustained this objection. O'Brien was then asked what he wrote in a report about Metcalf's "telling you about the likelihood of this being caused by dropping." Kuehn objected on the basis of hearsay, and the court overruled the objection. O'Brien testified, "I asked Doctor Metcalf if — I asked if it could have been caused by dropping Cameron. Doctor Metcalf told me that it didn't appear likely that that was the case."

Prior to the exchange that led to Kuehn's objections, O'Brien had been cross-examined by Kuehn's attorney, who read portions of O'Brien's deposition into the record. During that cross-examination, counsel elicited the fact that Metcalf had stated that Cameron had a subdural hematoma and that it was probably caused by Cameron's having been dropped. After defense counsel repeated information in O'Brien's deposition concerning Metcalf's opinion as to the cause of Cameron's injuries, the State

sought on redirect to clarify the information, leading to the questions which Kuehn objected to as hearsay. Kuehn initiated the line of questioning concerning statements made by Metcalf to O'Brien. The testimony was initially elicited by Kuehn's counsel, and the district court did not abuse its discretion in allowing the testimony on redirect.

## EVIDENCE OF PRIOR BAD ACTS

Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 1995), provides in relevant part:

> (2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006).

At Kuehn's trial, evidence was presented of earlier incidents involving Cameron. Kuehn asserts that the district court erred in giving a limiting instruction to the jury during the trial and at the close of the trial and in refusing to grant a mistrial because of the instruction. The court instructed the jury that evidence received concerning injuries to Cameron on June 15 and 28, 2004, was received to help the jury determine whether the August 4 injury was the result of an absence of mistake or accident.

Evidence was presented during the trial that Cameron had suffered prior injuries while in Kuehn's care on June 15 and 28, 2004. On June 15, Denise Gates, Cameron's mother, noticed a bump on Cameron's head and a bruise that covered his left eyebrow when she picked him up from Kuehn's house. Kuehn told Gates that she went to check on Cameron when he was crying and found that his diaper and bedding were wet. Kuehn allegedly set Cameron on the floor to change him and to change the bedding, and he leaned forward and hit his head twice. Cameron vomited twice before leaving Kuehn's house and again when he arrived home. Gates called Cameron's physician because "Cameron

didn't seem right. Cameron was a very happy, playful boy . . . he just wasn't himself." Gates took Cameron to the doctor the next morning. He continued to vomit for about 10 days, and Gates took him to the doctor several times.

On June 28, 2004, Cameron was "pale-like and dry heaving" when Gates picked him up at Kuehn's house. He was "crabby," did not want to play, and did not have a good appetite. Gates took Cameron to the doctor on June 30. Cameron vomited periodically until July 4. Pamela Williams, a registered nurse, testified that on June 28, Kuehn called the clinic where Williams worked and reported that Cameron had suddenly gone limp and that his eyes had rolled back in his head. Williams told Kuehn the clinic could get Cameron's parents' permission to treat him, but Kuehn told Williams that she would contact the parents and then bring Cameron in. Kuehn called later in the day and reported that she had not been able to contact Cameron's parents but that he had eaten lunch, taken a bottle, and seemed fine. Williams stated that she again recommended that Kuehn bring Cameron in because it is difficult to make a diagnosis over the telephone.

At a hearing concerning rule 404 evidence, Dr. Sandra Allbery, a pediatric radiologist at Children's Hospital, testified to the results of an MRI on Cameron that was completed on August 9, 2004. She stated that Cameron had brain hemorrhages that were of three different ages. One of the subdural hemorrhages was weeks to months old, and one was at least 3 days old. The subdural hemorrhages surrounded both hemispheres of his brain.

DeMare testified that Cameron had blood within the cranial cavity that was three different ages. Cameron had bilateral retinal hemorrhages that involved all four quadrants of the eye and signs and symptoms of traumatic brain injuries that ranged from less than 3 days old to months old. DeMare reviewed Cameron's medical records and stated that his symptoms were what would be expected with some type of repeated traumatic brain injury. He testified that the subdural hematomas occurred on June 15 and 28 and August 4, 2004. The district court found by clear and convincing evidence that Kuehn inflicted the injuries to Cameron on June 15 and 28 and that evidence of those injuries was admissible under rule 404(2) as proof of absence of mistake or accident as to the injury of August 4.

Rule 404(2) prohibits the admission of evidence of other bad acts for the purpose of demonstrating a person's propensity to act in a certain manner. *State v. McPherson*, 266 Neb. 715, 668 N.W.2d 488 (2003). Evidence of other crimes which is relevant for any purpose other than to show the actor's propensity is admissible under rule 404(2). *State v. McPherson, supra.* The admissibility of evidence under rule 404(2) must be determined upon the facts of each case and is within the discretion of the trial court. *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004).

Evidence of other bad acts falls into two categories under rule 404(2), according to the basis of the relevance of the acts: (1) evidence which is relevant only to show propensity, which is not admissible, and (2) otherwise relevant (nonpropensity) evidence, which is admissible. *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999). An appellate court reviews the admission of other bad acts evidence under rule 404(2) by considering (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. *State v. McManus, supra.*

This court has stated that a basic reason for refusing to allow evidence of other crimes is that "'such evidence is apt to be given too much weight, rather than too little, by the jury, thus resulting in the conviction of a defendant because he is a bad man and not because of his specific guilt of the offense with which he is charged.'" *State v. Casados*, 188 Neb. 91, 95, 195 N.W.2d 210, 213 (1972). Evidence of other crimes which are similar to the crime charged is relevant and admissible when it tends to prove a particular criminal intent which is necessary to constitute the crime charged. *Id.*

In *State v. Ray*, 191 Neb. 702, 704, 217 N.W.2d 176, 177 (1974), we quoted with approval from "I Wharton's Criminal Evidence (11th Ed.), § 350," as follows:

"'Testimony of other similar offenses has been admitted to show intent where there is or may be, from the evidence, an inference of mistake, accident, want of guilty knowledge, lawful purpose or innocent intent. Where an act is equivocal

in its nature, and may be criminal or honest according to the intent with which it is done, then other acts of the defendant, and his conduct on other occasions, may be shown in order to disclose the mastering purpose of the alleged criminal act.'"

We have noted that "[t]he principle reflected in that statement is peculiarly applicable to child abuse cases. Evidence of intent, in such cases, is ordinarily circumstantial, and injuries to children are ordinarily claimed to be accidental and unintentional." *State v. Morosin*, 200 Neb. 62, 68, 262 N.W.2d 194, 197 (1978). In child abuse cases, both the relevance and the prejudicial effect of evidence of prior similar acts is obvious. We held that testimony of a social worker as to a child's injuries and admission of a photograph of the child's injuries were both admissible for the limited purpose for which the evidence was considered based on "balancing tests frequently employed under modernized or codified rules of evidence." *Id.*

Other courts have also found that evidence of prior child abuse is admissible to show identity, intent, or lack of accident or mistake. See *State v. Widdison*, 4 P.3d 100 (Utah App. 2000). In that case, the defendant had made several statements that the child's injuries were the result of an accident in her crib, which required the State to prove absence of accident or mistake. In the case at bar, Kuehn told police that she may have shaken Cameron once when she picked him up and that he then fell out of her arms and hit his head on the playpen. The State therefore needed to show that Kuehn's actions were not the result of an accident.

The U.S. Court of Appeals for the Seventh Circuit has noted that there are usually no eyewitnesses to identify the source of injuries in child abuse prosecutions. *U.S. v. Leight*, 818 F.2d 1297 (7th Cir. 1987), *abrogated on other grounds, Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988). These cases are therefore "commonly built upon circumstantial evidence showing a pattern of repeated injuries suggesting child abuse," and the defendant often challenges the circumstantial evidence by arguing that the injuries were caused accidentally. *Id.* at 1301. The court stated that "[b]ecause of the difficulties commonly encountered in showing that a child has

been abused, courts have often treated evidence of abuse of other children as relevant and admissible." *Id.* at 1303. It held that because the defense was based on the theory that the child's injuries were accidental, the evidence that the defendant physically abused other children in her care was generally relevant to the contested issue.

When a defendant asserts that a child's injuries were accidental, the defendant has placed in issue whether the injuries were indeed the result of an accident. *Branstetter v. State*, 346 Ark. 62, 57 S.W.3d 105 (2001). See, also, *United States v. Naranjo*, 710 F.2d 1465 (10th Cir. 1983) (evidence of previous batteries of victim became admissible when defendant testified that shooting was accidental); *United States v. Woods*, 484 F.2d 127 (4th Cir. 1973) (exception for lack of accident ordinarily invoked only where accused admits he did acts charged but denies intent necessary to constitute crime).

Previous abuse of a child is admissible under rule 404(2) because it is "probative of a material issue other than character; that is, it was evidence of malice and absence of accidental death." *U.S. v. Boise*, 916 F.2d 497, 501 (9th Cir. 1990). In *State v. Norlin*, 134 Wash. 2d 570, 951 P.2d 1131 (1998), the Supreme Court of Washington held that evidence of prior injuries to a child is admissible in child abuse prosecutions to show absence of accident only if the State shows by a preponderance of the evidence that there is a connection between the defendant and the injuries.

The evidence of prior incidents in which Cameron was injured or ill while in Kuehn's care was properly admitted. The jury could have drawn legitimate inferences from the evidence. Courts have quoted the "doctrine of chances," which provides that "highly unusual events are highly unlikely to repeat themselves; 'the recurrence of a similar result . . . tends to establish . . . the presence of the normal, i.e. criminal, intent accompanying such an act . . . .'" *U.S. v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991) (quoting 2 John Henry Wigmore, Evidence in Trials at Common Law § 302 (James H. Chadbourn rev. 1979), *overruled on other grounds, Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999). The federal court continued, "The man who wins the lottery once is envied; the one who wins it twice is investigated." *Id.*

Evidence of other bad acts which is relevant for any purpose other than to show the actor's propensity to commit the act is admissible under rule 404(2). *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999). The evidence in this case showed that Cameron had sustained a bump on his head and a bruise on his left eyebrow while in Kuehn's care on June 15, 2004. Kuehn's explanation was that she set Cameron on the floor to change his diaper and that he leaned forward and hit his head twice. He vomited before leaving Kuehn's home and continued to vomit for about 10 days. On June 28, Kuehn called a clinic when Cameron suddenly went limp and his eyes rolled back in his head. He was "dry heaving" and vomited periodically for another 6 days. These are unusual events that occurred while Cameron was in Kuehn's care. The fact that Cameron had twice before shown either physical evidence of injuries or illness allowed the jury to consider whether Kuehn was responsible for Cameron's injury on August 4. The evidence was not offered to reflect on Kuehn's character, but, rather, to refute her contention that the injury was accidental.

Related to the rule 404(2) issue, Kuehn also assigns as error the district court's refusal to give the following proffered instruction:

1. There is no evidence that Denise Kuehn intentionally or knowingly caused an injury to Cameron Lampert on June 15, 2004.

2. There is no evidence that Denise Kuehn intentionally or knowingly caused an injury to Cameron Lampert on June 28, 2004.

3. There is no evidence that Cameron Lampert suffered any injury whatsoever on June 28, 2004.

4. There is no medical evidence establishing that any injury which occurred on June 15, 2004[,] and the event that occurred on June 28, 2004[,] is the proximate cause of either of the chronic subdural hematomas seen in Cameron Lampert on and after August 4, 2004[,] or the proximate cause or a proximate contributing cause of any injury which Cameron Lampert suffered on August 4, 2004.

And you must therefore completely disregard this evidence and put it out of your minds.

At the rule 404 hearing, the district court found that Kuehn had inflicted injuries upon Cameron on June 15 and 28, 2004. The jury was properly instructed regarding the evidence of the June 15 and 28 incidents, and the court did not err in refusing to give Kuehn's proposed instruction.

Kuehn also claims that errors related to the rule 404 evidence occurred during the State's opening statement and its closing argument. During opening statement, the State said that at the end of the case, it would ask the jury, "How many chances does a person get with a small child . . . to call it an accident?" Kuehn objected that the State was making a closing argument rather than an opening statement. The court overruled the objection. During closing argument, the State said it was returning to the question asked during opening statement concerning how many times a child can be injured and still have those injuries be considered accidental. Kuehn objected that the statement was an improper argument, irrelevant, and immaterial and that it drew an improper inference. Having determined that the evidence of the prior incidents was admissible, we conclude that this assignment of error is without merit.

### MOTION TO DISMISS OR FOR DIRECTED VERDICT

Kuehn also assigns error to the district court's overruling of her motion to dismiss or, in the alternative, for a directed verdict which she made at the close of the State's case. She argued that there was no competent admissible evidence that she intentionally or deliberately harmed Cameron on August 4, 2004, or at any other time. Kuehn argued that the only evidence as to causation was so speculative that it was insufficient to sustain a verdict. The district court overruled Kuehn's motion. This alleged error was waived when Kuehn offered evidence in her defense. See *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005). Kuehn renewed her motions at the close of her case, and the court overruled these motions.

 Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court

does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999).

The record shows that Cameron was injured while he was in Kuehn's care and that his injury caused severe damage. The physicians testified that Cameron's condition was not the result of a drop or fall as described by Kuehn. There was evidence of prior incidents in which Cameron sustained bruises or became ill while in Kuehn's care. The evidence was sufficient to support the conviction, and the district court did not err in failing to sustain the motion to dismiss or for a directed verdict made at the end of the trial.

### CROSS-EXAMINATION OF DR. JOHN PLUNKETT

Kuehn claims that the district court erred in overruling her objections to certain questions of a physician who testified on her behalf. The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. *State v. Stark*, 272 Neb. 89, 718 N.W.2d 509 (2006).

During cross-examination, Dr. John Plunkett was asked about other cases in which he had testified as an expert witness. Kuehn posed numerous objections, including that the questions were beyond the scope of direct examination, and attempted to impeach the witness on a collateral matter. Kuehn requested a "standing objection to impeaching a witness from nine years ago."

Neb. Rev. Stat. § 27-611(2) (Reissue 1995) provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The judge may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." See, also, *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001).

The right of cross-examination is an essential and fundamental requirement of a fair trial. *State v. Lewis*, 241 Neb. 334, 488 N.W.2d 518 (1992). In *Lewis*, a defendant claimed that the court improperly restricted his ability to cross-examine a witness. We stated, "'[A] defendant is entitled to engage in searching and

wide-ranging cross-examination, including anything tending to affect the accuracy, veracity, or credibility of a witness. . . .' " *Id.* at 345, 488 N.W.2d at 526. We noted that a ruling on evidence of a collateral matter that is intended to affect the credibility of a witness comes within the discretion of a trial court. *Id.* " ' "When the object of the cross-examination is to collaterally ascertain the accuracy or credibility of the witness, some latitude should be permitted, and the scope of such latitude is ordinarily subject to the discretion of the trial judge, and, unless abused, its exercise is not reversible error.' " *Id.* at 345, 488 N.W.2d at 526 (quoting *State v. Ballard*, 237 Neb. 729, 467 N.W.2d 662 (1991)).

Kuehn has not demonstrated that the district court abused its discretion in refusing to sustain her objections to the cross-examination of Plunkett. The State's questioning was not intended to impeach Plunkett on collateral matters, but, rather, was intended to question his credibility.

Kuehn also assigns as error the district court's rulings on a number of other objections made during Plunkett's testimony. Kuehn has not specifically argued any of these assignments of error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Deckard*, 272 Neb. 410, 722 N.W.2d 55 (2006). We find no merit to Kuehn's assigned errors related to Plunkett's testimony.

### DEPOSITION EXPENSES

The district court entered an order on March 22, 2005, directing Kuehn to pay $500 in advance for depositions of physicians. State law provides that in criminal cases, a defendant may apply in writing for a court order to examine witnesses prior to trial. See Neb. Rev. Stat. § 29-1904 (Reissue 1995). Kuehn assigns as error the district court's order.

The record in this case includes only a journal entry indicating that a telephone conference hearing had been held concerning fees to be paid in advance to three physicians for depositions. The district court directed Kuehn to pay $500 to each doctor prior to deposition, stating that reasonable fees would be determined at a later date if necessary. The record does not include a transcript of the telephonic hearing.

Kuehn filed an interlocutory appeal from the district court's order, and the appeal was dismissed for lack of jurisdiction by the Nebraska Court of Appeals on June 1, 2005, because there was no final, appealable order. See *State v. Kuehn*, 13 Neb. App. lxvii (No. A-05-516, June 1, 2005). We interpret Kuehn's complaint to be that she was directed to pay the witnesses for their depositions. We find no error in the district court's order. This court has held that a state statute

> does not provide for the taking of depositions at county expense in advance of the trial. Defendant was entitled to an order entitling him to take the depositions of witnesses, but when he coupled with it a demand that it be done at the expense of the county, he was not entitled to have his motion sustained.

*Vore v. State*, 158 Neb. 222, 227, 63 N.W.2d 141, 144 (1954), citing § 29-1904.

Kuehn did not seek status as an indigent, and we find no authority to suggest that she should not have been required to pay the expenses associated with depositions taken for her case. This assignment of error has no merit.

## EXCESSIVE SENTENCE

At all times relevant to this case, child abuse committed negligently was punishable by a maximum of 1 year in prison, a fine of $1,000, or both. See Neb. Rev. Stat. §§ 28-707(3) and 28-106 (Cum. Supp. 2004). Kuehn was ordered to pay a fine of $1,000 and placed on probation for 24 months, with terms including a 90-day sentence in jail and 200 hours of community service. She claims the sentence was excessive.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Griffin*, 270 Neb. 578, 705 N.W.2d 51 (2005). When a court sentences a defendant to probation, it may impose any conditions of probation that are authorized by statute. *State v. Lobato*, 259 Neb. 579, 611 N.W.2d 101 (2000). We find no abuse of discretion in the sentence imposed, and this assignment of error has no merit.

## CONCLUSION

Finding no merit to Kuehn's assigned errors, the judgment of conviction and sentence are affirmed.

AFFIRMED.

HEAVICAN, C.J., not participating.