754 N.W.2d 393 (2008)
276 Neb. 258
STATE of Nebraska, Appellee,
v.
Ryan L. POE, Appellant.
No. S-06-853.
Supreme Court of Nebraska.
August 1, 2008.
*396 Thomas C. Riley, Douglas County Public Defender, Mona L. Burton, and Robert Marcuzzo, for appellant.
Jon Bruning, Attorney General, and James D. Smith, Lincoln, for appellee.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

NATURE OF CASE
Following a jury trial, Ryan L. Poe was convicted of first degree felony murder and use of a deadly weapon to commit a felony. He was sentenced to life in prison plus a consecutive term of 10 to 20 years in prison on the weapon conviction. Poe appeals.

SCOPE OF REVIEW
[1, 2] In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. State v. Archie, 273 Neb. 612, 733 N.W.2d 513 (2007).
[3, 4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such *397 discretion a factor in determining admissibility. State v. Iromuanya, 272 Neb. 178, 719 N.W.2d 263 (2006). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. Id.

FACTS
On November 11, 2004, Trever Lee was shot and killed during a robbery of his townhouse in Omaha, Nebraska. Lee and his roommates, Nicholas Ertzner and Jeff Connely, were sleeping in three upstairs bedrooms when the front door of the townhouse was kicked in.
Connely testified he was awakened when he heard someone running up the stairs and shouting, "[P]olice." He opened his bedroom door and saw a person covered from head to toe in black and wearing a black mesh mask. The individual pointed a gun at Connely and told him to "get down." Connely complied. He saw another person with a gun in front of the door to Lee's bedroom.
Connely heard a struggle followed by multiple gunshots coming from the hallway. After the shooting stopped, he heard people running down the stairs. He called the 911 emergency dispatch service, went out into the hallway, and saw Lee on the floor. The autopsy of Lee's body revealed six gunshot wounds, as well as abrasions and contusions. His death was caused by a gunshot wound to the head behind the right ear.
Ertzner stated that one of the intruders came into his room, pointed a gun at him, and asked, "[W]here's the money[?]" Ertzner said he did not know what the man was talking about. The man told Ertzner to get down on the floor. The man took $50 to $70 cash from the pocket of Ertzner's pants that were in a laundry hamper and left the room. A second man came into Ertzner's room and also asked for money.
While on the floor, Ertzner looked into the hallway and saw a scuffle between Lee and at least one other person. He heard shots being fired for 3 to 5 seconds. When it was quiet, he checked on Lee and called to Connely to see if Connely was all right. Ertzner then returned to his room and stayed there until police arrived.
Connely testified he saw the wrist of one of the intruders and his skin was a "darker color." Ertzner described one of the intruders as 5 feet 5 inches to 5 feet 7 inches tall and between 170 and 180 pounds. The second man had a similar build. Poe was 5 feet 4 inches tall and weighed 145 pounds. Kashaun Lockett, who was also arrested in connection with the case, was approximately 5 feet 10 inches tall and weighed 150 to 160 pounds.
Connely had been selling marijuana from the townhouse since February 2004. Two of his customers were Keenan Barnes and Antwine Harper. Harper purchased marijuana from Connely and then sold it to others, including Poe. Harper testified that he supported himself by selling marijuana. Connely was Harper's supplier for several months prior to the shooting.
Police interviewed Harper as part of the investigation into Lee's death. Harper initially denied having any information concerning the shooting. During a second meeting with police, Harper drove with police to Connely's townhouse. Harper told police that Poe had driven him there on one occasion but that Poe had not entered the townhouse. During a third interview, Harper implicated Poe, Donte Reed, and Lockett in the shooting. Several weeks before the shooting, Poe had asked Harper if he could rob Harper's supplier. Harper told Poe not to rob *398 Connely because Harper paid his bills and fed his family by selling the marijuana he obtained from Connely.
At trial, Harper testified that on the morning of the shooting, he was at the hospital with his wife for the birth of their second child. Shortly before noon, Poe called Harper and said, "I just sent your dude to Texas." Harper understood that statement to be a street term for having killed someone.
When Poe was arrested on another charge, he called Harper and asked him to bail Poe out of jail. Poe said that if he did not get out of jail, "we're all going to go down," or words to that effect.
Two or three days after the murder, Poe told Harper that he went to Connely's house with Lockett and Reed. They kicked in the front door, went upstairs, kicked in another door, and asked one of the residents "where it was." Poe said the man stated, "I don't have it. It's not me." Poe went into another room, put a gun to the resident's head, and asked him, "[W]here's the bud at[?]" The man said, "[I]t's not me, it's not me."
Poe said he left the room and went to another room, where he found a naked man sleeping. Poe and Lockett woke the man, and a scuffle started between the man and Lockett. During the scuffle, Lockett lost a shoe. Each of the three men carried a gun, and all three fired at the naked man. Poe told Harper they disposed of the guns. Poe also said that they wore ski masks and that they disposed of the clothes worn at the time of the shooting.
Barnes testified that a few weeks prior to the incident, Poe brought up the subject of robbing Connely. Poe attempted to recruit Barnes on several occasions to participate in the robbery, including the morning of the shooting. Barnes said he refused to open his door when Poe showed up that morning.
A jury found Poe guilty of first degree murder and use of a weapon to commit a felony. He was sentenced to life imprisonment plus a consecutive term of 10 to 20 years' imprisonment for the use of a deadly weapon. He appeals.

ASSIGNMENTS OF ERROR
Poe assigns the following errors: The trial court (1) denied his right to present a complete defense by refusing to allow Poe to play the videotape of a police interview with Harper; (2) violated his right to confrontation by limiting Poe's cross-examination of Harper and Officers Brian Bogdanoff and Robert Laney concerning the police interview of Harper; (3) erred in allowing the State to present testimony of Poe's alleged membership in a street gang; (4) erred in allowing the State to present evidence of "field observation cards," which purportedly connected Poe and Lockett; and (5) erred in allowing testimony regarding ownership of a mask.

ANALYSIS

RIGHT TO PRESENT COMPLETE DEFENSE
Poe claims he was denied his constitutional right to present a complete defense because the jury was not permitted to view Harper's videotaped police interview. The videotape is purportedly a January 21, 2005, interview of Harper by Bogdanoff and Laney. Poe claimed that Harper was involved in the planning and execution of the crime, and Poe wanted the jury to observe the videotape of Harper's interview. Essentially, Poe wanted to attack Harper's credibility by having the jury view the police interview and compare it with Harper's testimony at trial.
The interview had not been transcribed, and Poe attempted to introduce the videotape *399 into evidence and to use portions of the videotape to show instances when Harper's statements were allegedly contrary to his trial testimony. Poe claimed that during the interview, Harper was threatened with criminal charges, and that the threat caused Harper to implicate Poe in the robbery and murder.
The videotape was discussed at several points during the trial. During cross-examination, Poe's counsel asked Harper whether the police had threatened him during the interview, and Harper stated, "I don't believe I said that." Counsel offered the tape to establish that during the interview, the police showed Harper a warrant for his arrest on drug charges. Harper testified that he considered the warrant to be a threat. Counsel then asked Harper if police told him that he was a "center pivot access in this whole thing." The State's objection of improper impeachment was sustained. At a sidebar conference, Poe's counsel stated he would make an offer of proof of the entire videotape to prove that the police had threatened Harper. The trial court expressed concern about showing the entire videotape, because on direct examination, Harper admitted the police had threatened him.
The videotape was marked as an exhibit, and the trial court was requested to watch the videotape. After viewing the interview, the court again sustained the State's objection to the videotape's admission. The exhibit was made a part of the court record, with the provision that it would not be shown to the jury.
The second offer of the videotape was made during the cross-examination of Laney. Poe's counsel again requested to show the interview to the jury because Laney stated he could not remember certain portions of it. The State objected because showing the interview to the jury was not the proper way to refresh Laney's recollection. The court again refused to allow the jury to view the interview, but permitted Laney to refresh his recollection by viewing it. After Laney reviewed the videotape, cross-examination resumed.
At another point, counsel sought to show the videotape to demonstrate who mentioned certain pieces of evidence first: the police officers or Harper. The trial court again declined to show the videotape because Harper and the officers had testified in court. Finally, after both parties had rested, Poe's counsel again asked that the jury be allowed to view a portion of the videotape to see how Harper's story had changed. Although the interview actually lasted 5½ hours, the videotape showed only about 2 hours. The trial court again denied the offer of proof.
Although the jury observed the demeanor of the police officers and Harper at trial, Poe claims he was denied an opportunity to present a complete defense, because the jury was not allowed to view the witnesses' demeanor, their tone of voice, and the emotions exhibited during the actual interview. He claims the jury should have been permitted to see whether "the threatening nature of the interrogation was the catalyst that resulted" in Harper's inculpating Poe. Brief for appellant at 16. Counsel wanted the jury to assess Harper's credibility by viewing the videotape.
At trial, Harper testified that he had not been honest with police during the first part of the interview, but that he was honest after the officers told him they were going to arrest him. Harper said the police told him there was an arrest warrant for him on marijuana charges, which Harper considered to be a threat. Poe's counsel asked: "Well, you were getting the feeling that they were putting you, as you put it or they put it, in the mix, right?" Harper testified: "Yeah. That was kind of *400 sort of." Harper testified that after the officers told him about the arrest warrant, he started crying because "[t]hey tried to take me away from my family" by bringing up the charges.
Harper said he told the officers he wanted a guarantee that he would not go to jail, because if he went to jail, there would be no one to care for his family. The police responded that they could not provide any guarantees. Harper stated that he was arrested and booked that day on the charges but was held for only 5 minutes before he was released on a "street release bond." The charges included a felony, but it was Harper's understanding that they would be dismissed if he cooperated.
Bogdanoff was cross-examined concerning any threats made to Harper. He told Harper there was an arrest warrant for him, but he denied that he had threatened Harper. Bogdanoff said a statement can be considered a threat, depending on how it is perceived. He told Harper that Lee's murder could have the death penalty associated with it and that people can get 50 years in prison on drug charges. The detectives had an affidavit for a drug charge on the table during the interview with Harper. Bogdanoff told Harper that it might be arranged for Harper to go home that day if he cooperated. Poe claimed the videotape would show how Harper had changed his story from "I don't know much to eventually saying that [Poe] confessed to him."
[5] The issue is whether the refusal to permit the jury to see the videotaped interview of Harper violated Poe's right to present a complete defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment ... or in the Compulsory Process or Confrontation clauses of the Sixth Amendment ... the Constitution guarantees criminal defendants `a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citations omitted).
We have previously held that it was not an abuse of discretion to refuse to allow an entire videotaped interview to be shown to a jury. In State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006), the trial court denied the defendant's request to play a 6½-hour interview between the defendant's wife and a police officer, because the videotape would cause undue delay and be a waste of time. We concluded that the trial court did not abuse its discretion in finding that the relevance of playing the entire interview was substantially outweighed by considerations of undue delay or a waste of time.
[6] Here, the content of Harper's interview was extensively covered on direct and cross-examination. The videotape shows that the officers repeatedly told Harper they could not make any promises to him about what would happen if he told them the truth. Harper expressed concern about going to jail and not being able to provide for his family. At one point during the interview, Harper cried. The officers told Harper a felony warrant might be activated if he did not cooperate by telling them the truth.
During the interview, the officers pointed out inconsistencies in Harper's previous statements. Harper eventually said that he would tell the officers "what [they] want[ed] to hear." Poe claims this statement shows that Harper was offering to skew the facts against Poe. However, Poe is asking this court to consider the statement out of context. After Harper's comment, Laney responded: "What you're saying is, `I'm going to give you what you want to hear.' What I'm hoping is you're going to tell me who did this." Harper then stated, "I'm going to tell you what *401 you want, but I've got to be able to go home tonight."
[7] Evidence can be excluded from a criminal trial under rules established by the Legislature and Congress. See Holmes v. South Carolina, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). The Court stated:
While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.
547 U.S. at 326, 126 S.Ct. 1727. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. State v. Iromuanya, 272 Neb. 178, 719 N.W.2d 263 (2006).
The rules of evidence allow the exclusion of evidence if its probative value is outweighed by other factors. Harper, Bogdanoff, and Laney all testified at trial. They were thoroughly and extensively cross-examined regarding the interview. The jury observed their demeanor and was able to evaluate their credibility. Harper was questioned whether he had been threatened and whether he was offered any deal in exchange for his testimony. Each testified concerning whether threats were made to Harper during the interview.
We conclude the refusal to allow the jury to view Harper's interview did not deny Poe a complete defense. Poe was permitted extensive and thorough cross-examination of Harper, Bogdanoff, and Laney. Although the jury did not see the videotape of the interview, Poe's counsel was permitted to question the witnesses concerning all aspects of it. The district court did not abuse its discretion in denying Poe's requests to play the videotape for the jury.

RIGHT TO CONFRONTATION
[8] In conjunction with his first argument, Poe claims that the trial court unreasonably limited his cross-examination of Harper, Bogdanoff, and Laney and, therefore, violated Poe's right to confrontation. Poe alleges he was prevented from fully exploring the threats and inducements made by police during the interview in order to get Harper to change his story.
[9-11] The right of a person accused of a crime to confront the witnesses against him or her is a fundamental right guaranteed by the 6th Amendment to the U.S. Constitution, as incorporated in the 14th Amendment, as well as by article I, § 11, of the Nebraska Constitution. State v. Stark, 272 Neb. 89, 718 N.W.2d 509 (2006). An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination. Id. The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. Id.
Poe attempted to establish that when Harper was threatened with arrest for selling drugs, he changed his story to implicate Poe. During the cross-examinations of Harper, Bogdanoff, and Laney, a number of the State's objections were sustained on the basis of hearsay or improper *402 impeachment. Because there was no transcript of the videotape, Poe argued that his only method to impeach the witnesses was to show the jury the videotape of the interview.
Poe's counsel had viewed the videotape and repeatedly asked the witnesses about its contents. The record establishes that Poe's counsel was permitted extensive cross-examination of all witnesses concerning the police interview of Harper. Harper was asked whether the police officers had threatened him, and he responded that he considered the arrest warrant to be a threat.
During cross-examination, Poe's counsel asked Harper if he felt the officers were putting him "in the mix" and Harper said, "[K]ind of sort of." Poe's counsel continued:
Q. At some point during the interviews did you become concerned that other people might get arrested and point the finger at you as being involved?
A. I don't remember.
Q. Okay. Was there conversation about that?
A. I can't recall.
Q. Isn't that when you get pretty upset?
A. Like I said, I know I got mad and I yelled a cuss word at them.
On further cross-examination of Harper, counsel asked: "[D]id the police tell you if you f[____] them, they're going to f[____] you back?" The State's objection was sustained on the ground of improper impeachment. Counsel then proceeded:
Q. Well, why don't you tell us what threats specifically were made to you[?]
A. They just told me about the charges.
Q. No, I want to know what they said.
A. I'm going to go to jail for the charges, for marijuana charges.
Q. They said you were going to go to jail?
A. Uh-huh, or something similar to that, or I had warrants for marijuana charges.
Q. Well, didn't they tell you what you had to do to stay out of jail?
....
[A.] I didn't make no deals.
Poe's counsel then asked: "Did [the police] tell you it depended on what you did as to whether they would activate [an arrest warrant on drug charges] or not?" The State's objection was sustained. Poe's counsel followed with another question:
Q. [S]o you told them what they wanted to hear so you wouldn't have to go to jail, right?
A. Yes.
Q. Specifically what were you told as to what could be done for you if you cooperated and what would happen if you didn't cooperate?
A. I don't remember, but I know no deal was made or nothing like that.
Q. Do you remember asking them for guarantees?
A. Yes. And they told me no.
On direct examination, Laney testified that he had talked to Harper about the drug charges and that during the interview, they told Harper that he would be charged with conspiracy to distribute marijuana. Laney believed it was at that point that Harper began to tell the officers what he knew about Poe's involvement in the shooting. Laney told Harper the officers would "go to bat" for him, which meant that they would let it be known to the county attorney that Harper had cooperated with them, but Laney also told *403 Harper he could not make any promises or deals.
Poe was permitted lengthy cross-examination of the witnesses concerning Harper's interview with the police. The jury heard the evidence concerning all aspects of Harper's interview with the officers.
[12] The U.S. Supreme Court has stated that the Confrontation Clause "`guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (emphasis in original), quoting Delaware v. Fensterer, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).
As noted earlier, the scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. State v. Stark, 272 Neb. 89, 718 N.W.2d 509 (2006). We conclude that the trial court did not abuse its discretion in its rulings concerning Poe's cross-examination of Harper, Bogdanoff, and Laney. The record does not establish that Poe's constitutional right to confrontation was violated by the trial court.

ALLEGED GANG MEMBERSHIP
Poe claims error occurred when the State presented irrelevant and unfairly prejudicial testimony of his alleged membership in a street gang. During Harper's testimony, he was asked if he knew whether Poe was a member of a gang. Harper testified that he had met Poe in 2000 or 2001 while they were at the same high school. Harper said that when he used to "hang out" on 29th Street in Omaha, he would see Poe there. Harper said there was a gang associated with that area and that he knew Poe was a member of that gang. Poe's objection on foundation and relevance was overruled. Harper testified without objection that Reed, his cousin, and Lockett, also a relative, were members of the "29th Street gang." Harper denied that he was a member of the 29th Street gang. Harper stated that Poe admitted he had committed the robbery and shooting at Lee's home with Reed and Lockett. Harper also said that he was afraid of Lockett's brother.
[13, 14] Poe claims his gang membership was not relevant. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence. Neb. Evid. R. 401. In considering the admission of relevant evidence, a trial court, when requested to do so, is required to weigh the danger of unfair prejudice against the probative value of the evidence. See State v. Duncan, 265 Neb. 406, 657 N.W.2d 620 (2003). The court was not asked to consider whether the evidence was unfairly prejudicial under Neb. Evid. R. 403. Poe's objection was based solely on whether the evidence was relevant.
This court has previously been asked to find that the suggestion of a defendant's gang ties results in prejudicial error. In State v. Iromuanya, 272 Neb. 178, 191, 719 N.W.2d 263, 279 (2006), the defendant cited to cases from other jurisdictions which held that "purposefully elicited testimony directly indicating gang membership was highly prejudicial," citing Ex parte Thomas, 625 So.2d 1156 (Ala.1993). However, we found that the Iromuanya case differed significantly because the record contained no explicit reference to street gangs.
It is true that "[g]enerally, the evidence which the State offers against a criminal defendant is prejudicial," but this court *404 must consider whether evidence is unfairly prejudicial. See State v. Myers, 258 Neb. 272, 292, 603 N.W.2d 390, 405 (1999). In that case, evidence of gang-related activity was offered, and we concluded that it did not create undue prejudice because the defendant's gang affiliation was related to the drug-dealing activities and conspiracy which were under investigation by police. We found no abuse of discretion in the admission of testimony about the defendant's gang activity.
The U.S. Court of Appeals for the Eighth Circuit has noted that while evidence of gang membership is admissible if it is relevant to an issue in dispute, "gang affiliation evidence is not admissible where it is meant merely to prejudice the defendant or prove his guilt by association with unsavory characters." U.S. v. McKay, 431 F.3d 1085, 1093 (8th Cir.2005). The appellate court found no abuse of discretion in allowing limited gang-related testimony, because it was relevant to the reasons the government did not attempt a controlled buy. In addition, the court cautioned the jury against using gang affiliation as a ground for conviction.
[15] We determine in the case at bar that evidence of Poe's alleged gang membership was relevant to the issues at trial. It demonstrated a connection or relationship among Poe, Reed, and Lockett, who were all implicated in the robbery and shooting death of Lee. The evidence also was relevant to Harper's credibility. It demonstrated Harper's initial reluctance to cooperate with police because he was afraid of Lockett's brother, who was also a member of the gang. The jury was instructed that in determining the credibility of any witness, it could consider "[a]ny other evidence that affects the credibility of the witness or that tends to support or contradict the testimony of the witness."
The exercise of judicial discretion is implicit in determinations of relevancy under Neb. Evid. R. 401, and a trial court's decision regarding them will not be reversed absent an abuse of discretion. See State v. Gutierrez, 272 Neb. 995, 726 N.W.2d 542 (2007). We find no abuse of discretion in the admission of the evidence related to Poe's gang affiliation.

FIELD OBSERVATION CARD
[16] Poe claims the trial court erred when the State was allowed to present, over objection, evidence of information contained in a field observation card that purportedly documented personal connections between Poe and Lockett. Poe argues that the field observation card was used to corroborate Harper's "theory" concerning Poe's involvement in the crime. Brief for appellant at 37.
The police department used field observation cards to maintain a databank linking individuals who associate with each other. During direct examination, Bogdanoff stated that police began to investigate Poe after a search of Barnes' residence revealed a map labeled "Operation Rush," which identified an area of townhomes. Bogdanoff then looked for any field observation cards related to Poe, and a card was located which indicated that Poe and Lockett had a connection. Further investigation found that DNA evidence from a shoe left at the scene of the homicide matched Lockett's DNA.
Poe asserts that the reference to the field observation card was hearsay because the information came from an unknown declarant at an unknown time and place and under unknown circumstances. At trial, Bogdanoff was asked whether Lockett was arrested in connection with this case. He responded, "Yes." No further references were made to any field observation card. Although Bogdanoff did not explain how the field observation card made the *405 connection between Poe and Lockett, we conclude that the allowance of this testimony, if error, was harmless beyond a reasonable doubt. The police had obviously made a connection between Poe and Lockett because Lockett was arrested for the same crime. There was other evidence at trial that connected Poe with Lockett, including Harper's testimony that Poe had implicated Lockett in the robbery and murder.
[17] In a harmless error review, an appellate court looks at the evidence upon which the jury rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the guilty verdict rendered in the trial was surely unattributable to the error. State v. Morrow, 273 Neb. 592, 731 N.W.2d 558 (2007), disapproved on other grounds, State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007). We conclude that the jury would have reached the same verdict regardless of whether the information concerning the field observation card was received into evidence.

OWNERSHIP OF MASK
[18] Poe claims the trial court erred when it allowed, over his hearsay objections, testimony from a police officer about the ownership of a black mask. The evidence showed that about noon on November 11, 2004, Poe flagged down Kevin Spellman near 30th and Spencer Streets in Omaha and requested a ride in Spellman's vehicle. Poe sat in the back behind the passenger's seat.
When the car stopped in the parking lot of a liquor store, a bicycle patrolman for the Omaha Police Department smelled the odor of marijuana coming from the car and obtained Spellman's permission to conduct a search of the car. The officer found a black mask tucked under the front passenger's seat. The mask was made of stretchy material and would cover the entire head. The officer testified that no one in the car claimed ownership of the mask.
Spellman testified that he was with his brother, David Moss, when Poe flagged him down. Poe was the only occupant of the back seat. While in the liquor store, Spellman saw two police officers next to the car, while Moss and Poe were outside the car. After giving the officers permission to search the car, Spellman saw one of the officers pull a mask from the back seat passenger area where Poe had been seated. Spellman testified that the mask was not in the car before he picked up Poe and that he cleaned out his car the day before.
Spellman said the officer pulled the mask out of the car, held it up, and asked to whom it belonged. Spellman responded, "It's not mine." He heard Poe say that neither the mask nor the car was his. Spellman described the mask as a black nylon "whole head" mask with a "[n]etted face area" and no eye or mouth holes. The mask was then placed back in Spellman's car. After he left the liquor store, Spellman threw the mask out of the car.
Officer Lowell Petersen, one of the police officers who searched the vehicle, was asked: "Did you ask any of the parties if the mask belonged to them?" He responded: "No." He was then asked whether anyone claimed ownership of the mask, and Poe objected to the response as hearsay. The objection was overruled, and Petersen testified, "No." Petersen testified that he asked no questions about the mask, no one claimed ownership of it, and he put the mask back in the car.
Poe argues that the nonverbal conduct of Moss, in failing to comment about ownership of the mask, was clearly intended as an assertion that the mask was not his. Moss did not testify at trial. Poe contends *406 that Moss' conduct constituted an out-of-court statement offered to prove the truth of the matter asserted and that the trial court erred in failing to recognize it as such.
We conclude the trial court did not err in overruling the hearsay objections and in admitting Petersen's testimony that he asked no questions about the mask and that none of the occupants claimed its ownership. Petersen's testimony was not hearsay because it was not offered to prove the truth of the ownership of the mask. Petersen testified to his observations and not to any statement or nonverbal conduct by any of the parties involved. The trial court did not err in overruling Poe's objections.

CONCLUSION
In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. State v. Archie, 273 Neb. 612, 733 N.W.2d 513 (2007). The evidence was sufficient to support the conviction. We find no prejudicial error and no merit to any of Poe's assigned errors. The judgment of the district court is affirmed.
AFFIRMED.
HEAVICAN, C.J., not participating.