### (d) Conclusion on Move

Having conducted a thorough review of the record in this case, I conclude Ember did not show that she has a legitimate reason to move Lillian to New York or that such a move is in Lillian's best interests. This case presents yet another difficult and unusual situation in the removal jurisprudence, which is the reason that I give deference to the trial judge's determination. See *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). I find that the district court's conclusion was not an abuse of discretion.

## IV. REMAINING ASSIGNED ERRORS

I concur with the majority opinion with respect to removal of the visitation restriction on Lillian's maternal grandmother, Chesley, and with regard to the determination of child support. As such, I would affirm the decision of the district court in its entirety.

———————

STATE OF NEBRASKA, APPELLEE, V.
LEWIS D. RAKOSNIK, APPELLANT.

___ N.W.2d ___

Filed July 15, 2014.    No. A-13-663.

1. **Jury Instructions: Judgments: Appeal and Error.** An assigned error of incorrect jury instructions is a question of law, and an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.
2. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.
3. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.
4. **Trial: Testimony: Appeal and Error.** The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion.

5. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

6. ____: ____. On a challenge to the sufficiency of the evidence, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

7. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

8. **Jury Instructions: Appeal and Error.** It is not error for a trial court to refuse to give a defendant's requested instruction where the substance of the requested instruction was covered in the instructions given.

9. **Appeal and Error.** An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground.

10. **Trial: Evidence: Appeal and Error.** On appeal, a defendant may not assert a different ground for his objection than was offered at trial.

11. **Criminal Law: Trial: Juries: Appeal and Error.** In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.

Appeal from the District Court for Pawnee County: Daniel E. Bryan, Jr., Judge. Affirmed.

John S. Berry, of Berry Law Firm, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

Inbody, Chief Judge, and Moore and Pirtle, Judges.

Pirtle, Judge.

## INTRODUCTION

Lewis D. Rakosnik appeals his convictions from the district court for Pawnee County where a jury found him guilty of 39 counts of knowing and intentional abuse of a vulnerable adult, attempted theft by deception, and attempted knowing and intentional abuse of a vulnerable adult. For the reasons that follow, we affirm.

## BACKGROUND

Lewis is the nephew of Joseph M. Rakosnik (Mike). Lewis began to care for Mike in early 2011 when Mike was already in hospice care and his longtime partner, Evelyn Doeschot, could no longer care for him alone. Prior to that time, Lewis was a home health physical therapist for several years in Arizona, but he had not worked in that field since 2009. In 2008, his mother moved from Nebraska to Arizona to live with Lewis because she was ill. In 2010, they returned to Wilber, Nebraska. After his mother's death, he received a call from Doeschot asking him to help care for Mike and he moved into Mike's house to do so. During that time, Lewis obtained Mike's power of attorney and exercised control over Mike's finances and effected several financial and property transactions while acting under Mike's power of attorney.

Lewis was charged by information on April 16, 2012. Mike died April 27. The State sought leave to file an amended information on May 1, 2013, and the amended document was filed the same day. The information alleged 39 counts of knowing and intentional abuse of a vulnerable adult, attempted theft by deception, and attempted knowing and intentional abuse of a vulnerable adult. A jury trial took place on May 7 through 10.

Christina Hain, a registered nurse who provided home health and hospice care for Mike, testified at trial. She stated that she had over 20 years of experience, that she had the skills to evaluate the mental and physical status of her patients, and that such evaluations are done on each visit. Mike became Hain's patient in the home health area in 2010 and shifted to hospice in February 2011. She saw Mike roughly twice per week, and she talked to Mike, his family, and his caregivers about Mike's condition. She testified that Mike's mental state varied with each visit and that he was confused, sometimes to the point of not remembering who his caregivers were, though they were his longtime girlfriend, Doeschot, and his nephew, Lewis. Hain reported Mike displayed some impaired decisionmaking and was confused about new things happening in his life. Hain reported that in April, May, and June 2011, Mike's mental state varied, but that he was consistently confused.

Trooper Cory Townsend, an investigator with the Nebraska State Patrol, was assigned to investigate the complaints in this case. He interviewed Mike on October 19, 2011, at Mike's residence. Lewis said that when he came to Nebraska, Mike needed some help walking, but that Mike's condition declined quickly in the fall of 2010. Lewis told Townsend that Mike had a CT scan showing some brain shrinkage, which he later described as dementia. Lewis told Townsend that he initially lived in his parents' house in Wilber and visited Mike and Doeschot every 3 days or so. In February 2011, when Mike entered hospice care, Lewis moved into Mike's home.

Lewis told Townsend that he became the primary caregiver and that soon after, he acquired Mike's powers of attorney, both medically and "overall." Lewis said Mike's hospice care told him that Mike needed a medical power of attorney, so he contacted Mike's attorney, Loren Joe Stehlik, to draft both powers of attorney. The documents were signed in mid-March at Mike's home. Lewis told Townsend that it took a while for Mike to understand he was signing documents granting Lewis his powers of attorney but that Mike eventually said, "I guess that would be okay." Lewis testified that he had no doubt Mike knew what he was doing when he signed the powers of attorney.

Carolyn Yoble, an employee of a branch of the Table Rock Bank, testified that she is a notary public and was asked to notarize the power of attorney created for Mike. She testified that she was asked to go to Mike's house to notarize a document because it was hard for Mike to get around. When she arrived, she observed that Mike was eating. She said that he was having trouble keeping food on the fork and getting the fork into his mouth and that Doeschot was helping him with the meal. Yoble said Mike was quiet and seemed tired, and needed help signing the document, so Doeschot supported his hand while he signed. Doeschot testified that she was present, but did not know if Mike knew what he was signing.

About 10 days after the power of attorney was signed and notarized, Lewis came into the bank and asked to change the payable on death provision on multiple certificates of deposit (CD's). The CD's were in Mike's safety deposit box and were

payable on death to Doeschot. Yoble said she was not in the bank when Lewis arrived, but she came in during the process and asked the teller not to change the provisions on the CD's until she knew the bank had the authority to make the change. After speaking to Mike's attorney, Stehlik, Yoble again told the teller not to make any changes. Lewis left with two CD's unchanged, but the change had already been made on two other CD's.

The next day, Lewis received a telephone call from the bank telling him to return the CD's to the bank. He was told the CD's would need to be reverted to their original form because the bank's attorney stated the payable on death payee could not be changed from Doeschot to himself. Lewis did not return them, but, rather, he took them to a different branch of the bank in August 2011 and asked that they be cashed. The money was deposited into Mike's account. Lewis later told Townsend that in March 2011, he used the power of attorney to change the payee on two of the CD's from Doeschot to himself and his three siblings.

Townsend asked Lewis about his assets, and Lewis said he did not have any. Lewis later recalled that he had a house in Arizona, a pickup truck, and an ownership interest in his parents' property in Wilber. He reported that he "ran out of money" in April 2011. He also reported that his physical therapy license expired sometime in 2010, but that he was eligible to renew it anytime within 3 years. Lewis reported that he was not eligible for unemployment and had a number of expenses, including gas, electric bills for the Arizona property, utilities for the Wilber property, taxes, insurance, et cetera. He also indicated he went to a casino approximately one to three times per week. He told Townsend he paid his utilities and other expenses for his houses in Arizona and Wilber from Mike's account. He also used Mike's account to pay his bills, and when asked whether he and Mike discussed that, Lewis said "not really."

Lewis also told Townsend about an "Edward Jones account" worth about $97,000. Lewis asked the broker how the money could be kept from going through probate and was told that there could be no beneficiaries assigned to the account, but

that he could use his power of attorney to cash out the account. The money was deposited into Mike's account, and Lewis wrote checks to several family members with that money. Townsend testified that there were numerous and frequent transfers from Mike's account to Lewis' account, but that they were not scheduled transfers or for consistent amounts.

Townsend also testified that Lewis made real estate transfers in Mike's name. Lewis told Townsend that it was his understanding that Mike's will granted Lewis and his siblings the 280 acres of land on which Mike's home was situated. The will contained a stipulation that the land could not be sold for a generation, so Lewis and his siblings could not sell the land. The will also stipulated that Doeschot would have the right to stay in the house and have access to the property for the remainder of her life, as long as she did not move out. Lewis told Townsend that he asked an attorney to create a life estate transferring ownership of the property from Mike to Lewis and his three siblings, but allowing Mike rights and all privileges and income from the land for his lifetime. The transfer Lewis executed did not include any restrictions on the deed or any provisions benefiting Doeschot.

When Townsend spoke with Mike in October 2011, he asked to see Mike's credit card and noted Mike had difficulty with the task. Mike was given his wallet and had trouble locating the card. He initially handed Townsend a check made out to him for the sale of his truck. Mike could not accurately relate what type of vehicle he sold. When Mike found the card, he could not identify who the cardholder was, which bank issued the card, or how long he had had the card.

When Townsend returned in January 2012, Mike could not identify the relationship between himself and Lewis. Mike told Townsend that Lewis was a hunter who had shown up asking for permission to hunt and had then just moved into the house. Townsend testified that he did not ask Mike whether he authorized Lewis to spend his money, because Mike could not find his credit card or tell him what car he owned. Townsend was not confident that Mike could accurately or intelligently tell him about his life estate, his holdings, the contents of his bank account, or how he wanted

these items handled upon his death. He also testified that Lewis' name was not on Mike's accounts and that there were no payments to Lewis' credit card accounts prior to the signing of the power of attorney.

Doeschot testified that she became involved with Mike in 1993 and that she had lived with Mike since 1999. She said she moved out of Mike's house in August 2011 because of disagreements she had with Mike about the CD's. She said Lewis accused her of stealing from Mike and made other derogatory remarks about her. When Mike was moved to a nursing home in 2012, Doeschot resumed her relationship with Mike and visited him almost every day.

Lisa Hunzeker testified that she and her husband rented farm ground from Mike and bought some land from him in January 2011. She testified that she took a rent check to Mike on July 1, gave it to Lewis, and told him what it was for. Lewis asked Hunzeker if she would be interested in buying the farm, and she told him that Mike and her husband had discussed buying the rest of the farm when they bought the first half. Mike had told Hunzeker that his nieces and nephews would be given the farm in his will and that for a certain number of years, it was required to stay in the family. In August 2011, Hunzeker and her husband got a letter from Lewis with an amendment to the contract for a land purchase from Mike. The amendment stated that on Mike's death, the payments for the land would go to Lewis and his siblings.

Stehlik testified that he had known Mike all of his life and that Mike had been a client since Stehlik started his practice. He testified that neither Mike nor one of his brothers had any children, but that their other brother was a father of four, including Lewis. He testified that he knew Doeschot very well and knew Mike lived with her for approximately 20 years. He stated that he drafted Mike's will in 2005 and helped Lewis to prepare a power of attorney for Mike in February 2011. The will gave Doeschot certain personal property and the use, possession, and control of the house and premises for her natural life. Mike left all of the real estate to his nieces and nephews, with the proviso that the real estate not be sold or mortgaged during their lifetimes.

Stehlik said Mike's condition had declined significantly after his visit in late January 2011: Mike was pale, he dozed off, and he could not carry a conversation. He did not see Mike during the periods between March to April or June to December 2011. He testified that he did not have any basis to observe, evaluate, or form any type of opinion on Mike's mental state from June through December 2011. He testified that by January 2012, Mike was "the same old Mike." Stehlik said that he believed Mike's condition was good enough to execute a new will on March 1 and that he was sure Mike understood it.

Don Davis, an adult protective services worker, met Mike and Lewis at Mike's home on August 30, 2011. He performed a "Goldfarb" assessment, which is a 10-question assessment used to determine a person's cognitive abilities, such as memory and decisionmaking. Mike was unable to relate to Davis what the date was. Instead, he remarked that it was hot and humid and said they were not able to plant crops early this spring. When asked his birth date, Mike replied that he had a birthday party but could not remember when. Mike was not able to respond with his address.

Davis saw Mike again on November 1, 2011. Mike was asked about his family, and the only name Mike could remember was "Mike." Mike remembered Doeschot as a hired girl that worked on the farm or in the household. Davis asked Mike about a photograph of his nieces and nephews, and Mike replied that the photographs were of him, his father, and his brothers. Mike was asked about his finances, and Mike said that he had $1,000 left, but that Doeschot owed him $1,500 from a loan. Davis stated that on March 2, 2012, Mike was unable to communicate audibly and Davis could not understand what was said. Davis said Mike's condition on March 2 was the worst he had seen.

Lewis moved for a directed verdict at the close of the State's evidence on counts 1 through 33 and counts 36 through 39. The court dismissed any breach of fiduciary duty in counts 38 and 39 of the information, but did not dismiss the State's case.

Lewis testified that there were times between February and December 2011 when Mike seemed disoriented and confused,

and times when he seemed to know what was going on. Lewis testified that he had an agreement with Mike to compensate him for working in Mike's home and that the agreement was that Lewis could "use whatever [he] needed." He testified that he made distributions of Mike's money because Mike was in hospice care and his health was not good. Lewis talked to Stehlik and another attorney about estate planning and tax ramifications and then cashed in accounts and distributed funds prior to Mike's death. Lewis said he was never worried that Mike would run out of money or that there would not be enough money to pay for Mike's care. Lewis stated that he did not believe there was anything wrong with the way he used Mike's money and that there was no limit on how much of Mike's money he was allowed to spend. He testified that he believed he was acting in Mike's best interests using his power of attorney and that spending money at the casino was in Mike's best interests.

Lewis admitted that he used Mike's money to pay his credit card bills. Lewis admitted to changing the beneficiaries on several CD's Mike held to benefit his siblings and himself. He admitted to withdrawing all of the funds from the Edward Jones account. Lewis testified that he used his personal credit card at the casino and that he also charged some of Mike's expenses on his personal card. He admitted to using Mike's checking account to pay off his credit cards and to write checks to his siblings. He admitted to using Mike's account to pay his property taxes in Arizona and bills for his mother's home in Wilber. He admitted that he created a warranty deed transferring an interest in Mike's land to himself and to his siblings. Lewis admitted that he took a rent check from Hunzeker and her husband and distributed it to himself and his siblings, even though Mike was still alive, the land was still titled to Mike, and the lease did not involve Lewis or his siblings.

Lewis' twin sister testified that she visited Mike several times while Lewis was caring for him. She said that "for the most part," Mike was very alert and oriented, but that he had periods of confusion. She identified three checks written on July 11, 2011, to herself and to her husband for their shares of

Mike's Edward Jones accounts and her share of Mike's land rental. She testified that she was a party to a lawsuit contesting the version of Mike's will dated March 2012. She stated her position in that case was that Mike did not have the capacity to sign his will in March 2012. She said she had no concerns about the legitimacy of the checks written by Lewis, because Mike gave Lewis his power of attorney.

Dr. Richard Jackson was Mike's doctor for about 30 years, and he testified that he met with Mike monthly in 2011. On cross-examination, Jackson said he did not conduct any evaluations of Mike's mental state and did not make any assessment about whether Mike could live independently. On redirect, Jackson said he did not feel the need to perform a mental evaluation based on his observations. On recross-examination, Jackson was asked if he prescribed medication for Mike that would be consistent with something he would prescribe for someone with mental problems. Lewis objected that the question was outside of the scope of direct examination, and the objection was overruled as long as it was within the time period Jackson indicated he saw Mike. Jackson said he prescribed Seroquel, which is classified as an antipsychotic medication, for Mike in September 2011.

The jury found Lewis was guilty of all counts set forth in the amended information. Lewis' motion for new trial was denied, and he was sentenced to a total of no more than 5 years in prison, with his sentences to run concurrently. Lewis timely appeals.

## ASSIGNMENTS OF ERROR

Lewis asserts the district court erred in giving the jury misleading, confusing, and incomplete instructions. He also asserts the trial court abused its discretion by allowing the State to go beyond the scope of direct examination in its cross-examination of Jackson. Lewis asserts the evidence was insufficient to prove his guilt beyond a reasonable doubt.

## STANDARD OF REVIEW

[1] An assigned error of incorrect jury instructions is a question of law, and an appellate court has an obligation to

reach an independent conclusion irrespective of the decision of the court below. See *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

[2] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id*.

[3] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Podrazo*, 21 Neb. App. 489, 840 N.W.2d 898 (2013).

[4] The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. *State v. Poe*, 276 Neb. 258, 754 N.W.2d 393 (2008).

[5,6] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013). On a challenge to the sufficiency of the evidence, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *id*.

## ANALYSIS

*Jury Instructions*.

[7] Lewis asserts the district court erred in giving the jury misleading, confusing, and incomplete instructions. In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a

substantial right of the appellant. *State v. Huff*, 283 Neb. 78, 802 N.W.2d 77 (2011).

[8] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Podrazo, supra*. It is not error for a trial court to refuse to give a defendant's requested instruction where the substance of the requested instruction was covered in the instructions given. *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005).

Lewis was charged with the crime of knowing and intentional abuse of a vulnerable adult. Neb. Rev. Stat. § 28-386 (Reissue 2008) states that a "person commits knowing and intentional abuse of a vulnerable adult if he or she through a knowing and intentional act causes or permits a vulnerable adult to be . . . exploited."

Lewis argues that the court erred in not including his proposed instruction on the meaning of "vulnerable adult" and that the need to find Mike fit that definition at the time of the alleged exploitation. His proposed instruction stated, "In order to find that [Lewis] exploited a vulnerable adult you must find beyond a reasonable doubt the exploitation occurred while the alleged victim was vulnerable." He asserts the court's failure to give the instruction prejudiced Lewis and misled the jury.

The evidence shows the district court declined to give the instruction proposed by Lewis because it was a restatement of instructions already prepared by the court to be given to the jury. Jury instruction No. 5 included definitions of "vulnerable adult" as defined in Neb. Rev. Stat. § 28-371 (Reissue 2008), "exploitation" as defined in Neb. Rev. Stat. § 28-358 (Reissue 2008), and "substantial mental impairment" as defined in Neb. Rev. Stat. § 28-369 (Reissue 2008). The jury instructions described the offense using the language of the statutes, and the Nebraska Supreme Court has previously held that it is proper for the court to describe the offense in the language of the statute. *State v. Kass*, 281 Neb. 892, 799 N.W.2d 680

(2011). The definitions presented to the jury conformed to the statutes and are presumptively correct.

Jury instruction No. 4 includes a recitation of the elements of each crime, stating that the jury must find that on a particular date, at a particular location, Lewis knowingly and intentionally caused or permitted a "vulnerable adult" to be exploited, and the instruction set forth the particulars of the transaction for each count. In light of this fact, we find Lewis' assertion, that the jury instructions given did not require a finding that Mike was a vulnerable adult at the time of the alleged exploitation, is without merit. We find the jury instructions that were given adequately and properly instructed the jury on the elements and definitions of the crime and were not prejudicial to Lewis.

Lewis asserts instructions Nos. 6 and 7 misled and confused the jury as to what elements the State had to prove. He argues that the instructions described elements of civil claims, not elements of the crimes he was charged with, and that they did not correctly state the law. The district court overruled Lewis' objection to instructions Nos. 6 and 7, finding they did not state that breach of fiduciary duty or undue influence were crimes; rather, the instructions were definitional in nature, and when read together with the remaining instructions, the instructions were not misleading as to the law.

The definition of exploitation in § 28-358 includes "the taking of property of a vulnerable adult by means of *undue influence, breach of a fiduciary relationship*," et cetera. (Emphasis supplied.) Thus, the definitions of "undue influence" and "breach of fiduciary relationship" were given in instructions Nos. 6 and 7 to assist the jury in determining whether a vulnerable adult was exploited. Upon our review, we find instructions Nos. 6 and 7, when read in light of all of the other instructions given, were not misleading or confusing to the jury and did not lead to prejudicial error. See *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

Lewis also asserts jury instruction No. 6 was misleading because it stated he could not profit from his duty as Mike's attorney in fact. He asserts that this instruction is contrary to Nebraska law, allowing for reimbursement of expenses and

compensation for agents under a power of attorney, and that it was incomplete without some reference to Neb. Rev. Stat. § 30-4012 (Cum. Supp. 2012).

[9,10] An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). On appeal, a defendant may not assert a different ground for his objection than was offered at trial. *State v. Watt, supra*.

Lewis' counsel objected to instruction No. 6 during the jury instruction conference, stating that "my concern is that it would be confusing to the jury and possibly unfairly prejudicial to [Lewis] because I'm concerned that breach of fiduciary duty is not necessarily a crime." There was no objection to the instruction on the basis that it was incomplete, nor was there any mention of § 30-4012, or whether it should apply. This issue was raised for the first time on appeal to this court, and therefore, we decline to address Lewis' assignment of error with regard to § 30-4012.

*Scope of Cross-Examination*.

Lewis further asserts the district court abused its discretion in allowing the State to go beyond the scope of the direct examination of Jackson in its recross-examination. Specifically, he asserts the State should not have been allowed to question Jackson regarding a medication prescribed to Mike because it was outside of the timeframe covered by the direct examination. Lewis' objection was overruled.

The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. *State v. Poe*, 276 Neb. 258, 754 N.W.2d 393 (2008).

The evidence shows that Lewis' objection was to a line of questioning by the State during recross-examination. The rule of practice is that a party should not be permitted to cross-examine a witness as to a matter foreign to the scope of his direct examination. See *In re Estate of Camin*, 212 Neb. 490, 323 N.W.2d 827 (1982). See, also, Neb. Rev. Stat. § 27-611 (Reissue 2008). In such situations, a party is usually required

to call the witness as his own and thus present the evidence material to the case. *In re Estate of Camin, supra.*

Although there is no specific rule as to the scope of recross-examination, it stands to reason that if the scope of the original cross-examination is limited to the original direct examination, then the scope of recross-examination is limited to the scope of redirect examination. Certainly, this has been the local custom or practice throughout most if not all of the trial courts in the State of Nebraska. However, assuming without deciding that this is the appropriate approach, we conclude the court did not abuse its discretion in allowing the question regarding medication. The record shows the defense asked Jackson, on redirect examination, if he felt the need to perform a mental evaluation on Mike, even though he did not treat him for a mental health purpose. Then on recross-examination, the State asked Jackson if he, in fact, had prescribed medication consistent for someone with mental health needs. Though Lewis objected that it was outside the scope of direct examination, Jackson was permitted to answer that he had prescribed Seroquel, which is classified as an antipsychotic medication.

[11] Even if Lewis' objection had been sustained, Jackson was a witness endorsed by the State on the information. As such, even if Jackson had not been allowed to answer the question about medication on recross-examination, he could have been recalled by the State as a rebuttal witness and that information would have been permitted on the State's direct examination. Thus, Jackson's testimony could have been entered regardless, and the court's decision to overrule, rather than sustain, Lewis' objection would amount to harmless error. In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. See *State v. McKinney*, 273 Neb. 346, 273 N.W.2d 74 (2007).

We find the court did not abuse its discretion in overruling Lewis' objection to the State's recross-examination of Jackson.

*Sufficiency of Evidence.*

Lewis asserts the evidence was insufficient to prove him guilty of all counts. He asserts that the State did not prove beyond a reasonable doubt Mike was a vulnerable adult and that the State failed to show Mike had substantial mental or functional impairment during the pertinent time period.

An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013).

Under the statutes, a vulnerable adult is a person with substantial mental or functional impairment. See § 28-371. Substantial mental impairment means a "substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, or ability to live independently or provide self-care as revealed by observation, diagnosis, investigation, or evaluation." § 28-369. Multiple witnesses testified that Mike was confused at various times in 2011 and 2012 and that they questioned his ability to make decisions or understand the documents he was asked to sign.

The evidence shows that Lewis moved into Mike's home, because Mike was in hospice care; Mike could no longer care for himself; and Doeschot needed assistance because she could no longer care for Mike on her own. Mike's nurse testified that Mike was consistently confused and that only the degree of his confusion changed. There were days when he could not tell her who his caregivers were, even though they were Doeschot, with whom Mike had lived for many years, and Lewis, his nephew.

Lewis himself told Townsend on October 19, 2011, that Mike had a CT scan showing some brain shrinkage, which he later described as dementia. Lewis also stated that he obtained Mike's power of attorney in March 2011 and disclosed that he "ran out of money" in April 2011. The documentary evidence shows significant amounts were drawn from Mike's bank accounts in March 2011 and the following months. The evidence shows that Lewis paid bills for his mother's house in Wilber and his own house in Arizona from Mike's accounts and that Lewis spent large amounts at casinos. He changed

the beneficiaries on CD's to his and his siblings' names, then cashed and distributed the funds to his family members using Mike's account. Witnesses testified that Mike intended his land to remain in his family for one generation before it could be sold. The new will, executed in March 2012, removed this provision, as well as the provision allowing Doeschot a life estate after Mike's death.

Davis, an adult protective services worker, met with Lewis and Mike on August 30, 2011, and performed a 10-question mental examination of Mike. Mike could not relate his own address or birth date. Davis visited Mike on other occasions and found he was consistently confused. Davis asked Mike about photographs of his nieces and nephews, and Mike said the photographs depicted his father and his brothers. Davis also testified that around the time Mike signed a new version of his will, removing Doeschot as a beneficiary and removing restrictions regarding Lewis and his siblings' use of his land, Mike was in the worst mental condition Davis had seen him.

The evidence suggests Lewis did not use the power of attorney to promote Mike's best interests, but, rather, it was used to ensure Lewis and his siblings would profit from Mike's holdings. The jury was tasked with deciding whether Mike was a vulnerable adult as defined by the statute. The record shows the jury determined that Mike was, in fact, a vulnerable adult and that Lewis exploited Mike's finances.

An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013). After viewing the evidence in the light most favorable to the prosecution, we find any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The evidence was sufficient to support the conclusions reached by the jury, and we find this argument is without merit.

## CONCLUSION

We find the district court did not give the jury misleading, confusing, or incomplete jury instructions. We find the district court did not abuse its discretion in overruling Lewis'

objection to the scope of the State's examination on recross-examination. We also find any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Affirmed.